# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GREENSILL CAPITAL (UK)      )
LIMITED, a foreign entity,      )
     )
     Plaintiff,      )
     )
     v.      )     Civil No. 4:17cv127
     )
TEMPUS INTERMEDIATE      )
HOLDINGS, LLC, a      )
Delaware corporation,      )
JACK GULBIN, an individual, and      )
B. SCOTT TERRY, an individual,      )
     )
     Defendants.      )

## EXPERT REPORT OF ADAM TOLLEY QC

A.    INTRODUCTION

1.    I have been instructed by the Plaintiff, Greensill Capital (UKI) Limited ("**Greensill**") to provide an opinion on certain matters of English law which are relevant to the present proceedings.

2.    I am a barrister in independent practice in England and Wales. I am a member of Fountain Court Chambers, Temple, London EC4Y 9DH. I have been practising as an independent barrister at these chambers since October 1995. In April 2014 I became a Queen's Counsel[1] ('QC' for short). I have specialist experience in a number of legal fields, including in particular commercial litigation and financial services. Such experience means that I am familiar with the law in relation to contracts in a commercial context and its practical application.

3.    A copy of my current CV is exhibited to this report at Annex 1. This sets out a summary of my qualifications and experience.

---

[1] A senior barrister who has been appointed by the Queen as 'one of Her Majesty's Counsel Learned in the Law'. The appointment is on merit and follows a competitive application process.

4.     The sources of the law of England and Wales[2] to which I refer are exhibited as Annex 2.

**B.     THE MATERIAL DOCUMENTS AND FACTS**

5.     For the purpose of preparing this report, I have been provided with copies of the following documents:

(1)     The Complaint (13 October 2017).

(2)     The Answer of the Defendants, Tempus Intermediate Holdings, LLC ("Tempus") and B. Scott Terry ("Terry") (8 December 2017).

(3)     The Answer of the Defendant, Jack Gulbin ("Gulbin") (8 December 2017).

(4)     Tempus' Responses to Greensill's First Set of Interrogatories (9 April 2018).

(5)     Tempus' Responses to Greensill's First Set of Admission Requests (9 April 2018).

(6)     Tempus' Responses to Greensill's First Request for Production (9 April 2018).

(7)     Terry's Responses to Greensill's First Interrogatories (9 April 2018).

(8)     Terry's Responses to Greensill's First Set of Admission Requests (9 April 2018).

(9)     Terry's Responses to Greensill's First Request for Production (9 April 2018).

(10)     Gulbin's Responses to Interrogatories, Requests for Admission and Request for Production of Documents (6 April 2018).

6.     In addition, I have also been provided with copies of the documents attached to the Complaint, which so far as material to this report comprise :

(1)     Exhibit A, consisting of the Parent Customer Agreement dated 16 October 2014 between Greensill and Tempus ("the **Customer Agreement**").

(2)     Composite Exhibit D, consisting of four Client Invoices issued by Bramid Outsource Limited to Tempus ("the **Invoices**").

---

[2]     For convenience, I will refer to 'English law'.

(3)       Composite Exhibit E, consisting of the PAUFs (payment assurance upload files) submitted by Tempus ("the **PAUFs**").

7.      The Customer Agreement is governed by English law.  Clause 10.1 of the Customer Agreement states as follows (so far as material):

> This Agreement and rights and obligations (whether contractual, quasi-contractual or non-contractual) arising out of or in connection with it shall be governed by and construed in accordance with the laws of England and Wales. ...

8.      I shall refer below to a number of other material provisions of the Customer Agreement.

9.      I do not comment in this report on the matters which arise between Greensill and each of Terry and Gulbin, which are not governed by English law.

## C.    THE ISSUES OR POTENTIAL ISSUES OF ENGLISH LAW

### (1)    Introduction

10.    I have reviewed the Complaint and the Answers of the Defendants in order to identify what issues or potential issues of English law arise or may arise in these proceedings. It appears to me that the following are matters on which the Court may be assisted by my report as to English law:

(1)      whether the Customer Agreement constitutes a valid and binding contract between Greensill and Tempus (paragraph 56 of the Complaint; paragraph 56 of the Answers);

(2)      whether any non-payment by Tempus constitutes a breach of the Customer Agreement by Tempus (paragraph 62 of the Complaint; paragraph 62 of the Answers); and

(3)      in the event that a breach of contract is established by Greensill, the applicable remedies (paragraph 63 of the Complaint; paragraph 63 of the Answers).

11.    In preparing this report, I have had regard to the contents of the leading practitioner textbook on matters of English contract law, namely Chitty on Contracts (32nd edition) (2015, updated 2018) (to which I shall refer for short as "Chitty").

*(2)*   *The Validity of the Customer Agreement*

12.   The general rule of English law is that a contract does not have to take any particular form and can be made informally: Chitty, ¶5-001. In so far as there are any formal requirements, they are contained in legislation which deals with specific types of contract (such as contracts for the disposition of an interest in land or consumer credit contracts). The Customer Agreement is of a type which does not fall within any of the categories so regulated and there is no formal requirement which applies to it.

13.   English law also requires that, in order to form a binding contract, the contract should either be made as a deed (which is a particular form) or supported by some 'consideration': Chitty ¶ 4-001. This concept requires merely that some value should be given by each party to a contract; the courts are not in general concerned with the question whether the value that has been given is adequate: Chitty ¶ 4-014. In the absence of some special factor, such as the existence of a relationship in which one party is able to take unfair advantage of the other, the general position is that the courts will enforce a promise so long as *some* value for it has been given.

14.   In my view, the Customer Agreement is clearly supported by consideration, by reference to the mutual exchange of promises contained in it. The 'Customer' (Tempus) is able to enter into commercial trade transactions with a 'Supplier' for the sale of goods or supply of services to the 'Customer, on the basis that the amount payable by the 'Customer' to the 'Supplier' is assigned to the 'Financial Institution' (Greensill) and recoverable on the stated 'Maturity Date' from the 'Customer' by the 'Financial Institution'.

*(3)*   *Breach of Contract*

15.   The starting-point in any case involving a claim of breach of contract is to interpret the words of the agreement. In particular, all questions relating to payment of a sum of money in pursuance of a contract depend on the construction of the terms of the contract: Chitty ¶21-040.

16.   In doing so, the essential question is to identify the intention of the parties by reference to what a reasonable person, having all the background knowledge which would have been available to the parties, would have understood them to be using the language in

4

the contract to mean.  In brief summary, that meaning has to be assessed in the light of (a) the natural and ordinary meaning of the words used; (b) any other relevant provisions of the document in question; (c) the overall purpose of the contract and the clause or clauses in question; (d) the facts and circumstances known or assumed by the parties at the time that the contract was made; and (e) common sense; but (f) disregarding subjective evidence of any party's intentions.  There are many relevant cases – the most important are *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900, *Arnold v Britton* [2015] UKSC 36; [2015] AC 1619, and *Wood v Capita Insurance Services Ltd* [2017] UKSC 24; [2017] AC 1173.  I have not analysed these cases in detail in this report because it appears to me that ascertaining the meaning of the Customer Agreement is straightforward.

17.   English law distinguishes between a claim for payment of a debt and a claim for damages for breach of contract.  A debt is a definite sum of money fixed by the agreement of the parties as payable by one party in return for the performance of a specified obligation by the other party or on the occurrence of a specified event or condition.  By contrast, damages may be claimed from a party who has broken his primary contractual obligation in some way other than by failure to pay such a debt.  It is also possible that, in addition to a claim for a debt, there may be a claim for damages in respect of loss caused by the failure to pay the debt on the due date: see Chitty ¶ 21-040.

18.   In practice, it is frequently the case that a party who wishes to bring a claim in respect of the payment of a debt will also claim damages for breach of contract in relation to the act of non-payment.  Obviously, the amount in question may be recovered only once.

19.   In the present case, the material terms of the Customer Agreement have been set out in the Complaint, at paragraphs 16-26.

20.   On the premise that the Court were to conclude that each of the 'Accounts Receivable' identified by Greensill had been assigned by Bramid to Greensill, it would follow that, pursuant to clause 2.2 of the Customer Agreement, there would be an "independent, irrevocable, unconditional, legal, valid, transferable and binding obligation" on Tempus

to pay to Greensill, as the 'Transferee' of the 'Supplier', an amount equal to the relevant 'Certified Amount' by 12:00 London time on the relevant 'Maturity Date'.

21.   In the event that such an amount was not paid in accordance with clause 2.2 of the Customer Agreement, an English court would be bound to conclude that there had been a breach of the Customer Agreement to the extent of such non-payment.

### (4)   *Remedies*

22.   As I have explained above (my paragraph 18), it is open to a party in the position of Greensill to make a claim in debt and a claim for damages for breach of contract against the party in the position of Tempus, provided of course that there is no double-recovery.

23.   In view of my analysis of the Customer Agreement, and the question of breach of the Customer Agreement, it would follow that Greensill has a claim in debt, alternatively for damages for breach of contract, in respect of the amount or amounts not paid by Tempus in accordance with the obligation contained in clause 2.2 of the Customer Agreement.

24.   This amount has been identified in the Complaint as $9,658,224.34, exclusive of interest, attorney's fees and costs.  The calculation of the amount due is of course a matter for the Court.

25.   As to interest, clause 2.9 of the Customer Agreement provides that if Tempus fails to make any payment, or to cause payment to be made, when due under the Customer Agreement where such failure is not remedied within 5 'Business Days', interest on the unpaid amount shall accrue daily, from and including the due date of payment to but excluding the date of actual payment (both before and after judgment), at the 'Default Interest Rate'.  The 'Default Interest Rate' is defined to mean the interest rate set out in the "table above".  The table appears on the first page of the Customer Agreement, and states that the 'Default Interest Rate' is USD LIBOR (daily) plus 10% per annum.

26.   The English court will in general enforce any express provision in a contract for the payment of interest (except where the situation is covered by a specific statutory provision): Chitty ¶¶ 26-227, 26-244, 39-285. There is no such statutory provision applicable to the Customer Agreement.  Accordingly, in the event that it upheld

Greensill's claim, the English Court would also award interest at the 'Default Interest Rate', including the periods before and after judgment.

**D.**   **STATEMENTS OF BELIEF**

27.   I confirm that in so far as the facts stated in my report are within my own knowledge I have made clear what they are and I believe them to be correct, and that the opinions I have expressed represent my accurate and complete professional opinion.

28.   I also confirm that in preparing this report, I am aware that my primary duty is to the Court and not the person(s) from whom I have received my instructions or by whom I am paid.  My work in relation to this report has been charged at the rate of £500.00 per hour.

Signed:   .............................................................................................

**Adam Tolley QC**

Date:        25 June 2018

7

# ANNEX 1



# Adam Tolley QC   Call Date: 1994 | Silk Date: 2014

Adam has a wide-ranging practice, specialising in commercial and employment law.

Adam's commercial practice covers the whole range of commercial litigation, including particular recent experience in banking, financial services, consumer credit, insurance and professional negligence.

His employment practice encompasses both High Court and Employment Tribunal litigation. He has particular specialisations in issues of post-termination restrictions and confidentiality and, in relation to ET litigation, discrimination and whistleblowing claims.

In addition, Adam undertakes work in the fields of personal tax, primarily (but not exclusively) in the context of employment, and privacy and confidentiality.

## AREAS OF EXPERTISE

- Banking & finance
- Commercial dispute resolution
- Employment
- Insurance and reinsurance
- Professional negligence
- Tax

## RECOMMENDATIONS

Recommended in the legal directories in Commercial Dispute Resolution; Employment and Banking & Finance.

Comments in Chambers & Partners include:

- "He has an excellent manner with clients and explains complex legal arguments clearly." (2018)
- "very knowledgeable about a broad range of finance matters"; "very good with clients" (2015)
- "calm, considered and extremely bright"; "grasps matters quickly, and is also extremely personable and very client-friendly"; "good on cases involving a banking crossover" (2015)

- "a very strong, clever barrister" (2014)
- "amazing intellect"; "commercial, sensible and has a sharp eye for detail" (2012)
- "valued for his mature, sharp and sensible advice" (2011)
- "absolutely committed and exceptionally patient in his work" (2010)

Comments in Legal 500 include:

- 'An excellent communicator, who is always very responsive, efficient and user-friendly.' (2018)
- 'He is supremely knowledgeable and is extremely methodical in his approach.' (2018)
- "recommended for his good depth of knowledge and experience" (2017)
- "incredibly approachable and knowledgeable on financial services disputes" (2017)
- "reassuringly clever, always beautifully calm and a pleasure to work with"; "accessible and easy to work with" (2014)
- "an excellent technical lawyer with sound commercial judgement" (2012)
- "enthusiastic and committed" (2011)
- "clients adore [him] ... extremely responsive" (2010)

## EDUCATION

BA Jurisprudence (Oxon) First Class honours

BCL (Oxon) First Class honours

## APPOINTMENTS

QC – 2014

Junior Counsel to the Crown, 'A Panel', 2007 – 2012, reappointed 2013-2014

## RECENT PRACTICE

Commercial Litigation:

Commercial litigation forms the core of Adam's practice and includes both general commercial work as well as specific areas such as banking, insurance, financial services and conflicts of laws. Additional information about Adam's banking, insurance and financial services practices is set out below (and more specific information is available on request).

Recent cases include:

- Capita (Banstead 2011) v RFIB Group [2016] QB 835 – Court of Appeal – construction of indemnity clause and scope of professional's continuing duty of care
- Allied Fort v Creation [2015] EWCA Civ 841 – summary judgment in breach of fiduciary duty claim in context of insurance broking
- Tael One Partners v Morgan Stanley [2015] Bus LR 278 – Supreme Court – construction of standard Loan Market Association terms
- Talos Capital v JCS Investment Holding XIV [2014] EWHC 3977 (Comm) – Commercial Court – challenge to jurisdiction

- British Credit Trust v Scotland and Reast [2014] Bus LR 1079 – Court of Appeal – a leading authority on the unfair relationships regime under the Consumer Credit Act 1974 in the context of lending for PPI
- VTB Bank v Skurikhin [2013] 2 All ER (Comm) 418 – a claim under s25 CJJA in relation to Russian proceedings, involving issues arising in respect of freezing injunctions and provision of asset information
- Acting in a wide variety of derivatives mis-selling litigation, including the full range of interest rate hedging transactions and structured FX derivatives
- Acting as an expert witness on English law in proceedings in Russia, Singapore and the Republic of Ireland

Adam has acted on many injunction applications, frequently at short notice. Typical examples include freezing orders, enforcement of restrictive covenants and prevention of breach of confidence. Adam also has specific recent experience in the areas of franchising, partnership and commercial agency.

<u>Employment and discrimination:</u>

Adam has extensive experience of both large-scale commercial employment litigation (restrictive covenants, confidentiality, fiduciary duties, TUPE) and high-value individual employment litigation, frequently involving both High Court claims and Employment Tribunal proceedings. He also deals with goods and services discrimination claims.

Much of Adam's employment work overlaps with commercial litigation and arises in the contexts of banking and financial services. He has in-depth knowledge of the financial adviser sector, and represented the defendant in Ashcourt Rowan v Hall [2013] IRLR 637, a case concerning garden leave and the enforceability of restrictive covenants. Adam was instructed to act on behalf of ENRC in an intervention in a Commercial Court trial to protect confidential information obtained in the course of employment. He also recently appeared in a Commercial Court trial involving allegations of breach of fiduciary duty and breach of contract against a corporate finance consultant.

Adam also deals regularly with test cases involving issues of general importance or the interpretation of terms of employment. He appeared on behalf of the Department of Business in Lock v British Gas [2016] ICR 503, as to commission and holiday pay, and in Bear Scotland v Fulton and Baxter [2015] ICR 221, the leading case on overtime and holiday pay. He also recently represented the Department for Transport in an appeal concerning the contractual incorporation of sickness absence management procedures: Sparks v DfT [2016] ICR 695.

In addition, Adam has been instructed in many cases involving the termination of the contracts of senior executives of leading companies, and claims for breach of contract in relation to bonus and other incentive schemes.

Adam has particular recent experience in relation to the operation of National Minimum Wage in commercial contexts and HMRC enforcement procedures.  Adam acted on behalf of HMRC in Daler-Rowney v HMRC [2015] ICR 632 (EAT), an appeal relating to work done by foreign students.

In relation to ET litigation, Adam has represented HRH The Prince of Wales in successful defence of tribunal proceedings alleging race discrimination and sex discrimination by former employees at Highgrove and Clarence House. He has also represented HRH The Princess Royal (successful defence of tribunal

claim for unfair redundancy dismissal) and the Duchy of Lancaster (claim for wrongful dismissal settled before trial).

Adam has "DV" security clearance, enabling him to act in matters involving national security, both in the commercial sector (involving employers such as British Airways) and in the public sector.

Adam acts for claimants as well as respondents, including particular recent experience of "whistleblowing" dismissals, as well as discrimination, bullying and stress at work litigation.

Other recent and notable cases include:

- Various v HMRC – acting for HMRC in numerous appeals as to the application of IR35 in relation to TV newsreaders and presenters
- Reed Employment v HMRC [2015] STC 2518 – Court of Appeal – salary sacrifice; 'over-arching' or 'job-by-job' contracts of employment in the context of travel expenses schemes
- Weight Watchers v HMRC [2012] STC 265 – Upper Tribunal – employment status of Weight Watchers' Leaders

Banking and Financial Services:

Most recently, Adam has acted in a wide variety of interest rate swap, foreign exchange and other derivative mis-selling claims, involving many different types of business and swap products. He has experience of claims involving allegations of LIBOR manipulation, as well as claims as to the conduct of the FCA Review in specific cases (including claims for declarations).

Adam is acting on behalf of a high street bank in defence of proceedings involving allegations of malicious presentation of a bankruptcy petition. He also recently acted on behalf of two major banks in the defence of claims of race discrimination concerning the closure of bank accounts and the application of the international sanctions regime against Iran.

Adam represented the lender in the leading Court of Appeal decision, BCT v Scotland and Reast [2014] Bus LR 1079, about the attribution of responsibility in relation to 'unfair relationship' claims under the Consumer Credit Act 1974.

In January 2013 Adam was appointed as counsel to the Parliamentary Commission on Banking Standards, with particular reference to the Sub-Panel on Mis-Selling and Cross-Selling. This work involved the questioning of witnesses on live TV (BBC Parliament).

Adam has experience of both international and domestic banking issues. Cases with an international dimension include VTB v Skurikhin, involving Russian litigation and claims for s25 CJJA relief in England, and Barclays v Svizera, involving a claim by syndicated lenders against international pharmaceutical companies, including issues as to a share sale governed by Brazilian law.

Domestic banking cases have involved a wide range of issues, including a broad variety of issues under the Consumer Credit Act 1974, the enforcement of security, including guarantees, and allegations of misrepresentation and undue influence.

Insurance:

Adam acted in a recent dispute about the interpretation of an insurance business transfer scheme, involving the question of its application to PPI mis-selling claims and complaints to the Financial Ombudsman Service – PA (GI) v GICL 2013 [2016] Lloyd's Rep IR 125.

In relation to direct insurance work, Adam's recent experience includes:

- acting in direct claims between insured and insurers in respect of coverage disputes, for example, Hatton v Brit Insurance (claim by householder re serious injury suffered by individual working on buildings at his home – "employment" status of victim – successful defence of proceedings following trial)
- acting in claims for and against insurers re avoidance issues, for example, Sharon's Bakery v Axa and Aviva [2012] Lloyd's Rep IR 164 (issues re non-disclosure of moral hazard and fraudulent devices)

Professional Negligence:

Adam's professional negligence work encompasses the widest range of claims. He has extensive experience in relation to financial advisers, tax advisers, fund managers and pension fund administrators and contributes to the chapter on Financial Services in Professional Negligence and Liability (Informa, looseleaf). Much of his recent work in this field has concerned claims arising from the ineffective implementation of changes to pension schemes. He has also particular recent experience in claims against tax advisers in respect of film finance schemes, and claims against solicitors in relation to employment advice and litigation.

Personal taxation:

Adam is and has been instructed by HMRC in a wide variety of cases, frequently involving overlap between matters of employment law and tax law. Notable cases include:

- Paya v HMRC [2016] FTT 660 – application of IR35 to BBC newsreaders – scope of FTT rules as to intervention by BBC as non-party
- Martin v HMRC [2015] STC 478 – UT – tax treatment of payment due from employee to employer arising on breach of 'golden handcuffs' clause – 'negative earnings'
- Reed Employment v HMRC [2014] STC 1982 – UT – salary sacrifice; deductibility of home-to-work travel expenses for temporary employees
- Weight Watchers v HMRC [2012] STC 265 – UT – employment status of Weight Watchers Leaders

Confidentiality, Privacy and Protection of Information

In addition to his employment work, Adam has considerable experience of confidentiality, privacy and protection of information issues in other contexts, including personal privacy (EWQ v GFD [2012] EWHC 2182), data protection and ICO investigations.

Other Fields of Work:

Adam's wide-ranging experience enables him to act in cases involving overlap between two or more areas of law. He has extensive experience in the fields of conflicts, partnership, company and insolvency law. Further details of such experience are available on request.

LANGUAGES

French (competent)

## MEMBERSHIPS

COMBAR, PNBA, ELBA, ILS

## PUBLICATIONS

Co-author (with Peter Hamilton, Simon Beckwith and Alison Potter) of the chapter on Financial Services in Professional Negligence and Liability (Informa, looseleaf)

## OTHER EXPERIENCE

Adam is a reviewer for the Bar Pro Bono Unit

## INTERESTS

Trying to find time to spend with my family

Challenging unlawful parking tickets issued to my electric car (current score 15-0 in my favour, including two appeals to the Parking Adjudicator)

Closely following the fortunes of Celtic FC (mostly enjoyable, occasionally maddening but never dull)

---

**LONDON**
Fountain Court Chambers
Fountain Court, Temple
London EC4Y 9DH
chambers@fountaincourt.co.uk
Tel: +44 (0)20 7583 3335
Fax: +44 (0)20 7353 0329
DX: 5 LDE

**SINGAPORE**
Ocean Financial Centre
#37-06/10
10 Collyer Quay
Singapore 049315
Tel: +65 6808 6611

# ANNEX 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GREENSILL CAPITAL (UK)            )
LIMITED, a foreign entity,        )
                                  )
      Plaintiff,                  )
                                  )
v.                                )        Civil No. 4:17cv127
                                  )
TEMPUS INTERMEDIATE              )
HOLDINGS, LLC, a                 )
Delaware corporation,            )
JACK GULBIN, an individual, and  )
B. SCOTT TERRY, an individual,   )
                                  )
      Defendants.                 )

## INDEX TO ANNEX 2 - EXPERT REPORT OF ADAM TOLLEY QC

| Item | Details | Report ¶ |
|------|---------|----------|
| 1. | Chitty ¶ 5-001 (Chapter 5 Section 1) | 12 |
| 2. | Chitty ¶¶ 4-001, 4-014 (Chapter 4 Sections 1 and 13) | 13 |
| 3. | Chitty ¶ 21-040 (Chapter 21 Section 4) | 15; 17 |
| 4. | *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 | 16 |
| 5. | *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900 | 16 |
| 6. | *Arnold v Britton* [2015] UKSC 36; [2015] AC 1619 | 16 |
| 7. | *Wood v Capita Insurance Services Ltd* [2017] UKSC 24; [2017] AC 1173 | 16 |
| 8. | Chitty ¶ 26-227 (Chapter 26 Section 12 (a)) | 26 |
| 9. | Chitty ¶ 26-244 (Chapter 26 Section 12 (e)) | 26 |
| 10. | Chitty ¶ 39-295 (Chapter 39 Section 2 (b)) | 26 |

# Chitty on Contracts 32nd Ed.

## Consolidated Mainwork Incorporating Second Supplement

## Volume I - General Principles

## Part 2 - Formation of Contract

## Chapter 5 - Form

## Section 1. - In General

**The general rule**

**5-001**

The general rule of English law is that contracts can be made quite informally: no writing or other form is necessary. At common law there was only one exception to this rule: a corporation had to contract under seal until the last vestiges of this rule were abolished in 1960. [1] At present, all formal requirements in the law of contract are contained in legislation which deals with specific contracts. There are four main purposes for making such formal requirements. [2] First, they may serve as clear evidence of a transaction and of its terms. Secondly, they may have a cautionary effect, thereby deterring hasty, premature or ill-considered contracts being made. Thirdly, they may have a "channelling" function, offering "a legal framework into which a party may fit his actions", [3] Thus, formalities may mark off transactions from one another and create a standardised form of transaction. [4] Fourthly, formal requirements may be used as a device to protect the weaker parties to contracts. There has been an increasing tendency to impose such requirements with this last purpose in view: for example, in the cases of tenants, employees, debtors and sureties under consumer credit agreements [5] and consumers of certain classes of services, such as package holidays [6] or "timeshare" accommodation. [7] Formal requirements are discussed in relation to a number of specific contracts in Vol.II of this work. [8] In the present volume, which deals with general principles, there would be no point in attempting to make an exhaustive list of contracts for which formal requirements are imposed by statute. But four general matters may usefully be discussed here: types of formal requirement; the effects of non-compliance; the impact of estoppel; and contracts made by electronic communications.

**Types of formal requirement**

**5-002**

Legislative requirements of form differ widely from one another. In a few cases, contracts are required to be made by deed: this is true, for example, of a lease for more than three years. [9] More frequently the requirement is that certain contracts must be in, or evidenced in, writing; but even requirements of this kind vary a good deal in stringency. Some statutes simply require, in general terms, that the contract must be in writing, or that there must be a note or memorandum in writing. [10] Others set out the formal requirements in great detail and even specify the size of the lettering and the colour of the print and paper. [11] Yet others do not require the contract to be, or to be evidenced in, writing at all, but only require one party to give the other written notice of specified terms of the contract. [12] The form of a contract may also affect the regulation which it attracts, rather than going to its validity. Thus, for example, the scheme of rules governing "construction contracts" as first enacted under Pt II of the Housing Grants, Construction and Regeneration Act 1996 applied only "where the construction contract is in writing", any other agreement between the parties being "effective for the purposes of this Part only if in writing". [13] However, "[t]his was interpreted restrictively by the courts such that all of the non-trivial terms of construction contracts had to be 'in writing' for Part 2 to apply". The Act has been amended so as to remove this general requirement, whilst prescribing that various matters must nonetheless be in writing. [14]

**Duties of information as requirements of form**

### 5-003

[⬡] The law sometimes imposes on a business or professional a pre-contractual duty to provide information relating to certain matters, as in the case of consumer credit agreements. [15] Information requirements are particularly prevalent in EU contract law, where they have been imposed on traders towards consumers generally [16] as regards contracts concluded in certain circumstances ("distance contracts" and "offpremises contracts" [17]) and in respect of certain types of contract such as "timeshare" [18] [⬡] and package travel, package holidays and package tours. [19]

**Effect of non-compliance**

### 5-004

Non-compliance with statutory requirements of form may produce various effects. It may make the contract void, [20] or unenforceable, [21] or unenforceable by one party [22] or enforceable only on an order of the court. [23] It may simply deprive the transaction of certain effects which it would have had, if the formal requirement had been observed, without generally impairing its validity or enforceability; this would be the case, for example, if a lease for more than three years were not made by deed [24]; if an assignment of a chose in action were made orally [25]; or if the sort of promise which is normally contained in a bill of exchange or promissory note were made orally. Failure to comply with formal requirements may also be a criminal offence, and in some cases this is the sole consequence of failure which is actually specified in the relevant statute. [26] The civil consequences of failure to comply with a statutory requirement of form in such a case would presumably depend on the court's view of the objects which the legislature sought to achieve in imposing the requirement. If the requirement was imposed to protect one of the parties to a contract, that party would probably be able to enforce the contract notwithstanding the formal defect; whether the other party could enforce it would depend on principles discussed elsewhere in this book. [27]

**Requirements of form and estoppel**

### 5-005

As will be described in more detail below in relation to contracts for the sale or other disposition of an interest in land, the application of the various doctrines of estoppel have sometimes caused difficulty in relation to contracts invalid for want of the applicable formality. [28] In this regard, the House of Lords in *Actionstrength Ltd v International Glass Engineering IN.GL.EN SpA* [29] in the context of s.4 of the Statute of Frauds made clear that while in an appropriate case where there had been a clear representation by a party that the contract was valid (despite any want of formality), [30] the courts should not found an estoppel simply on the informal agreement itself. [31] As Lord Hoffmann observed:

> "The terms of the Statute of Frauds therefore show that Parliament, although obviously conscious that it would allow some people to break their promises, thought that this injustice was outweighed by the need to protect people from being held liable on the basis of oral utterances which were ill-considered, ambiguous or completely fictitious. This means that while normally one would approach the construction of a statute on the basis that Parliament was unlikely to have intended to cause injustice by allowing people to break promises which had been relied upon, no such assumption can be made about the statute … [I]t must not be construed in a way which would undermine its purpose." [32]

**Contracts made by electronic communications**

**5-006**

The Electronic Communications Act 2000 created a power in the appropriate Minister to issue statutory instruments in order to modify provisions of: "… any enactment or subordinate legislation … in such manner as he may think fit for the purpose of authorising or facilitating the use of electronic communications" for a number of purposes, including the making of contracts. [33] Moreover, art.9(1) of the European Directive on Electronic Commerce 2000 [34] provides that:

> "Member States *shall* ensure that their legal system allows contracts to be concluded by electronic means. Member States shall in particular ensure that the legal requirements applicable to the contractual process neither create obstacles for the use of electronic contracts nor result in such contracts being deprived of legal effectiveness and validity on account of their being made by electronic means." [35]

Article 9 continues by allowing Member States to provide for exceptions to this principle notably in "contracts that create or transfer rights in real estate, except for rental rights" [36] and "contracts of suretyship granted and on collateral securities furnished by persons acting outside their trade, business or profession". [37] Where it applies, this obligation on Member States is not limited to the conclusion of the contract, but extends to all aspects of the contractual process. [38]

**Impact on formality requirements**

**5-007**

At first sight, art.9 of this Directive might appear to have required the United Kingdom to revise a good deal of its law of contractual formalities, much of which requires a contract to be contained or evidenced in writing and/or signed, neither of these appearing to be able to be achieved by electronic means. However, the Law Commission advised the Government that in general requirements of "writing" and of "signature" can be fulfilled via some electronic means without any changes being made to the law. [39] So, as to "writing" this requirement can be fulfilled by electronic mail and website trading, but not by electronic data interchange as this does not involve any visible text so as to satisfy s.5 of the Interpretation Act 1978's definition of writing. [40] Its view is that "writing" does not need any "physical memorial", such as paper. [41] Secondly, the Law Commission's view was that requirements of signature can generally be interpreted in a functional way, by asking whether or not the conduct of a would-be signatory indicates an authenticating intention to a reasonable person, though each requirement must be considered in its own statutory context. [42] Following this approach, a requirement of signature can be fulfilled in a number of ways: by "electronic signature" using a dual-key encryption system and a certification authority [43]; by use of a manuscript signature scanned into a computer and incorporated into an email or other document; by a person typing their name or initials or by setting up a system by which this occurs automatically [44]; and even by a purchaser on a website "clicking" a button after entering onto the web details of the goods that they wish to purchase, confirming payment and personal details. [45] The Law Commission concluded that:

> "… there is no need for general legislative reform, because we consider that legislation is not only unnecessary but also risky. It is difficult to envisage a simple global reform that would be effective in all eventualities … [So], it is only in very rare cases that the statute book will conflict with Article 9 of the Electronic Commerce Directive." [46]

Where legislative change is needed, it can be effected by exercise of the power contained in s.8 of the Electronic Communications Act 2000. One particular context in which this may need to be the case is s.2 of the Law of Property (Miscellaneous) Provisions Act 1989. For, as will be explained, in this context it has been said that "signature" must be given its ordinary linguistic meaning, so as to require each of the parties to contracts for the sale or other disposition of an interest in land to write their names with their own hands upon the document. [47] However, some or all of the contracts contained within this category may come within one of the exceptions to art.9 of the EU Directive so

as to allow English law to retain a formal requirement which is inconsistent with the effectiveness of a contract made by electronic means. [48] Moreover, the courts may well consider that in some other statutory contexts (for example, contracts of guarantee under s.4 of the Statute of Frauds) either "writing" or "signature" should not be interpreted as broadly as the Law Commission generally propose, in the interests of the protection of the person to be bound thereby. [49] Here, without legislative intervention, a conflict may arise between the interpretation of the English courts and the requirements of art.9 of the Electronic Commerce Directive, which does allow a Member State to make an exception for contracts of suretyship but only where undertaken by persons "acting outside their trade, business or profession". [50]

### Electronic signatures

## 5-008

⟦⟧ In 1999, the EU legislator enacted the Electronic Signatures Directive, [51] ⟦⟧ whose purposes were to facilitate the use of "electronic signatures" and to contribute to their legal recognition, and to establish a legal framework for electronic signatures and certain certification-services: it expressly did not cover aspects relating to the conclusion or validity of contracts or other legal obligations where there are requirements as regards form imposed by national or Community law, nor the rules and limits governing the use of documents. [52] ⟦⟧ An "electronic signature" was defined by the Directive as "data in electronic form which are attached to or logically associated with other electronic data and which serve as a method of authentication". [53] ⟦⟧ The United Kingdom implemented the Electronic Signatures Directive 1999 by two instruments. First, s.7 of the Electronic Communications Act 2000 provided for the admissibility in evidence of electronic signatures and certification by any person of such a signature "in relation to any question as to the authenticity of the communication or data or as to the integrity of the communication or data, and followed for this purpose the definition of "electronic signature" in the Directive. [54] ⟦⟧ On its terms, this provision is broad enough to include evidence for the purposes of formal requirements of a contract (such as s.2 of the Law of Property (Miscellaneous Provisions) Act 1989 [55] ⟦⟧), but, if it were so interpreted, it would go beyond the scope of the requirements of the 1999 Directive. Secondly, the Electronic Signatures Regulations 2002 provided for the supervision and liability of "certification-service-providers" (i.e. persons who issue certificates or provide other services related to electronic signatures) and for consequential matters relating to data protection. [56] ⟦⟧ However, the Electronic Signatures Directive 1999 was repealed and replaced by the EU Electronic Identification and Electronic Trust Services Regulation 2014 (the "eIDAS Regulation", applicable in general from July 1, 2016), [57] ⟦⟧ which lays down the conditions under which Member States mutually recognise "electronic identification means of natural persons and legal persons falling under a notified electronic identification scheme of another Member State", and "rules for trust services, in particular for electronic transactions"; and which establishes "a legal framework for electronic signatures, electronic seals, electronic time stamps, electronic documents, electronic registered delivery services and certificate services for website authentication", [58] ⟦⟧ Following the pattern of the 1999 Directive, the eIDAS Regulation provides expressly that it "does not affect national or Union law related to the conclusion and validity of contracts or other legal or procedural obligations relating to form". [59] ⟦⟧ Instead, its main purpose is to ensure that businesses and individuals can use their own national electronic identification schemes (eIDs) to access public services in other EU countries where electronic identification schemes are available; it also aims to create a European internal market for electronic trust services—electronic signatures, electronic seals, time stamps etc.—by ensuring that they will work across borders and have the same legal status as traditional paper-based processes. [60] ⟦⟧ By way of implementation of some aspects of the eIDAS Regulation, the UK revoked and replaced the Electronic Signature Regulations 2002 by the Electronic Identification and Trust Services for Electronic Transactions Regulations 2016, which came into force on July 22, 2016. [61] ⟦⟧ The 2016 Regulations also amended s.7 of the Electronic Communications Act 2000 so as to follow the simplified definition of "electronic signature" in the eIDAS Regulation as:

"so much of anything in electronic form as—

(a)

    is incorporated into or otherwise logically associated with any electronic communication or electronic data; and

(b)

    purports to be used by the individual creating it to sign." [62]

The main import of s.7 remains the same, viz. to make general provision for the recognition of electronic signatures as evidence in legal proceedings. [63] The 2016 Regulations also make new provision for electronic seals and related certificates, electronic time stamps and related certificates, electronic documents and related certificates and electronic registered delivery service and related certificates. [64] However, the eIDAS Regulation itself (as earlier noted [65]) does not affect the law governing the definitions of signature for the purposes of formal requirements of English contract law [66]; nor does its provision for "electronic seals" affect the common law or statutory requirements for the execution of a deed. [67] It is submitted that the uncertainty as to the impact of s.7 of the Electronic Communications Act 2000 in relation to these same formalities remains after its amendment by the 2016 Regulations. [68]

**Electronic documents and deeds**

## 5-009

Following the recommendations of the Law Commission, [69] the Land Registration Act 2002 made provision for the creation of a framework in which it will be possible to transfer and create interests in registered land by electronic means through a network controlled by the Land Registry. [70] In order to permit this, Pt 8 of the Act makes provision for the fulfilment electronically of formality requirements by the transactions in question, doing so by assimilating certain qualifying electronic documents to deeds for the purposes of any enactment requiring the dispositions to which those documents relate to use a deed. However, the system of electronic conveyancing which these legislation provisions envisaged has not been brought into being and the Law Commission has consulted on a different scheme. [71]

---

1.    Corporate Bodies' Contracts Act 1960.

2.    Fuller (1941) 41 Col.L.Rev. 799; Law Commission No.164 (1987), pp.6–7; Whittaker, *Themes in Comparative Law in Honour of Bernard Rudden* (2002), p.199.

3.    Fuller (1941) 41 Col.L.Rev. 799, 801.

4.    Law Com. No.164 (1987), p.7.

5.    Landlord and Tenant Act 1985 s.4 (provision of rent books); Consumer Credit Act 1974 ss.60, 61, 105 (form and content of agreement; form of securities) and see Vol.II, paras

39-080—39-081.

5. The Package Travel, Package Holidays and Package Tours Regulations 1992 (SI 1992/3288) reg.9, on which see Vol.II, paras 38-132—38-133.

6. Timeshare, Holiday Products, Resale and Exchange Contracts Regulations 2010 (SI 2010/2960) reg.15, replacing the Timeshare Act 1992 (as amended) on which see Vol.II, paras 38-136—38-139.

7. See Vol.II, Chs 34, 37, 39, 40 and 45.

8. Law of Property Act 1925 ss.52, 54, as amended by Law of Property (Miscellaneous Provisions) Act 1989 s.1(8), Sch.1 para.2.

9. e.g. Statute of Frauds 1677 s.4 discussed Vol.II, paras 45-042 et seq.

10. e.g. Regulations made or to be made by the Secretary of State under the Hire-Purchase Act 1965, under the Consumer Credit Act 1974 s.60 see Vol.II, para.39-080.

11. e.g. Landlord and Tenant Act 1985 s.4; Employment Rights Act 1996 ss.1–2, 4–6 (as amended); Estate Agents Act 1979 s.18.

12. Housing Grants, Construction and Regeneration Act 1996 s.107 (which defined what was meant by agreement in writing for this purpose) on which see *RJT Consulting Engineers Ltd v DM Engineering (Northern Ireland) Ltd [2002] EWCA Civ 270, [2002] 1 W.L.R. 2344; Hatmet Ltd v Herbert (t/a LMS Lift Consultants) [2005] EWHC 3529 (TCC)* at [23]; *Allen Wilson Joinery Ltd v Privetgrange Construction Ltd [2008] EWHC 2802 (TCC), [2009] T.C.L.R. 1.* Section 107 of the 1996 Act was repealed as explained in the following footnote.

13. UK Government's Explanatory Notes to the Local Democracy, Economic Development and Construction Act 2009. The Housing Grants, Construction and Regeneration Act 1996 s.107 was repealed by Local Democracy, Economic Development and Construction Act 2009 Sch.7(5) para.1. The various matters which must be in writing are contained in s.108 of the 1996 Act (as inserted by s.139 of the 2009 Act).

14. On which see Vol.II, paras 39-076—39-077. See also, e.g. Estate Agents Act 1979 s.18.

15. Directive 2011/83/EU on consumer rights [2011] O.J. L304/64 art.5 implemented in UK law by the Consumer Contracts (Information, Cancellation and Additional Charges) Regulations 2013 (SI 2013/3134) especially reg.9 ("on-premises contracts"), and see Vol.II, paras 38-056 et seq. especially paras 38-097—38-098.

16. Directive 2011/83/EU on consumer rights [2011] O.J. L304/64 art.6 implemented in UK law by the Consumer Contracts (Information, Cancellation and Additional Charges) Regulations 2013 (SI 2013/3134) especially regs 10–11, 13, and see Vol.II, paras 38-056 et seq. especially paras 38-091—38-096.

17. Directive 2008/122/EC on the protection of consumers in respect of certain aspects of timeshare, long-term holiday product, resale and exchange contracts [2009] O.J. L33/30 art.4 implemented in UK law by the Timeshare, Holiday Products, Resale and Exchange Contracts Regulations 2010 (SI 2010/2960) regs 12–13 on which see Vol.II, paras 38-136—38-138. The 1990 directive is repealed by Directive (EU) 2015/2302 on package travel and linked travel arrangements [2015] O.J. L326/1, art.4 of which sets a general principle of full harmonisation and must be implemented by January 1, 2018.

18. Directive 90/314/EEC on package travel, package holidays, and package tours [1990] O.J. L158/59 arts 3 and 4 implemented in UK law by the Package Travel, Package Holidays and Package Tours Regulations 1992/3288 regs 7 and 8 on which see Vol.II, paras 38-132—38-138.

20. Bills of Sale Act (1878) Amendment Act 1882 s.9; Law of Property (Miscellaneous Provisions) Act 1989 s.2.

21. e.g. Law of Property Act 1925 s.40 subsequently repealed and replaced by s.2 of the Law of Property (Miscellaneous Provisions) Act 1989 see above, paras 1-108, 1-112 and below, para.5-039.

22. Consumer Credit Act 1974 s.65; Timeshare, Holiday Products, Resale and Exchange Contracts Regulations 2010 (SI 2010/2960) regs 20–24 ("right of withdrawal").

23. Consumer Credit Act 1974 s.127.

24. Law of Property Act 1925 s.52 ("void for the purpose of conveying or creating a legal estate"); and see s.54, as amended by the Law of Property (Miscellaneous Provisions) Act 1989 s.1 and Sch.1 para.2.

25. Below, paras 19-007, 19-016, 19-037.

26. e.g. Landlord and Tenant Act 1962 s.1, repealed and replaced by Landlord and Tenant Act 1985 s.4; *Shaw v Groom [1970] 2 Q.B. 504.*

27. i.e. on the principles stated in *St John Shipping Corp v Joseph Rank Ltd [1957] 1 Q.B. 267;* below, paras 16-152 et seq.

28. See below, paras 5-041—5-049.

29. *[2003] UKHL 17, [2003] 2 A.C. 541.*

30. e.g. *Shah v Shah [2001] EWCA Civ 527, [2001] 4 All E.R. 138.*

31. *[2003] UKHL 17 at [9], [25].*

32. *[2003] UKHL 17 at [20].* On the Statute of Frauds s.4, see Vol.II, paras 45-042—45-061.

33. Electronic Communications Act 2000 s.8(1).

34. Directive 2000/31 on certain legal aspects of information society services, in particular electronic commerce, in the Internal Market [2000] O.J. L178/1.

35. Emphasis added.

36. Directive 2000/31 art.9(2)(a).

37. Directive 2000/31 art.9(2)(d).

38. Directive 2000/31, Recital 34; Beale and Griffiths (2002) L.M.C.L.Q. 467, 468.

39. Law Commission, Electronic Commerce: Formal Requirements in Commercial Transactions (2001), available in full at http://lawcommission.justice.gov.uk and see a shorter version in Beale and Griffiths (2002) L.M.C.L.Q. 467 to which the following references will relate.

40. Beale and Griffiths (2002) L.M.C.L.Q. 467, 471–472. The Interpretation Act 1978 s.5 states that: " *"Writing"* includes typing, printing, lithography, photography and other modes of representing or reproducing words in a visible form, and expressions referring to writing are construed accordingly."

41. Beale and Griffiths (2002) L.M.C.L.Q. 467, 472.

42. Beale and Griffiths (2002) L.M.C.L.Q. 467, 473.

43. And see below, para.5-008.

44. In *J Pereira Fernandes SA v Mehta [2006] EWHC 813 (Ch), [2006] 2 All E.R. 881* at [25]–[30], it was held that the automatic insertion of an email address in a message by an internet service provider did not constitute a signature by the writer of the message as it did not represent any intention to authenticate the message by the writer. However, Judge Pelling Q.C. accepted that: "[I]f a party or a party's agent sending an e-mail types his or her or his or her principal's name to the extent required or permitted by existing case law in the body of an e-mail, then ... that would be sufficient signature for the purposes of section 4 [of the Statute of Frauds]" (at [31]), the learned judge noting the position of the Law Commission to this effect. In *Golden Ocean Group Ltd v Salgaocar Mining Industries Pvt Ltd [2012] EWCA Civ 265, [2012] 1 Lloyd's Rep. 542* at [32] it was common ground before (and accepted by) the CA that an electronic signature is sufficient for the purposes of s.4 of the Statute of Frauds and that a first name, initials or perhaps a nickname will suffice, as long as it was done in a manner which indicates that it is intended to authenticate the document. And in *Bassano v Toft [2014] EWHC 377 (QB), [2014] E.C.C. 14* at [42]–[44] it was held that clicking an electronic "I accept" button and thereby generating a document sent to the other party bearing the "signatory's" typed name constituted signature for the purposes of s.61 of the Consumer Credit Act 1974: see Vol.II, para.39-084.

45. Beale and Griffiths (2002) L.M.C.L.Q. 467, 473–474.

46. Beale and Griffiths (2002) L.M.C.L.Q. 467, 473.

47. *Firstpost Homes Ltd v Johnson [1995] 1 W.L.R. 1567, 1574–1577* and see below, para.5-037.

48. Directive 2000/31 art.9(2)(a), above, para.5-006.

49. cf. *J Pereira Fernandes SA v Mehta [2006] EWHC 813 (Ch), [2006] 2 All E.R. 881* at [31], where the Law Commission's broad approach was approved (and see above, n.44).

50. Directive 2000/31 art.9(2)(d), above, para.5-006.

51. Directive 1999/93 on a Community framework for electronic signatures [2000] O.J. L13/12.

52. Directive 1999/93 art.1.

53. Directive 1999/93 art.2(1).

54. Electronic Communications Act 2000 s.7(2) (as enacted).

55. On which see Vol.I, paras 5-010 et seq.

56. SI 2002/318.

57. Regulation (EU) 910/2014 of 23 July 2014 on electronic identification and trust services for electronic transactions in the internal market and repealing Directive 1999/93/EC [2014] O.J. L 257/73 art.52(2) (with the exceptions there noted).

58. Regulation (EU) 910/2014 art.1.

59. Regulation (EU) 910/2014 art.2(3) and recital 21.

60. See EU Commission, https://ec.europa.eu/digital-single-market/en/trust-services-and-eid.

61.   SI 2016/696.

62.   SI 2016/696 reg.5, Sch.3 para.1(2). The definition of certification of such an electronic signature was amended to similar effect: SI 2016/696 reg.5, Sch.3 para.1(3).

63.   Electronic Communications Act 2000 s.7(1).

64.   Electronic Communications Act 2000 ss.7A–7D (as inserted by SI 2016/696 reg.5, Sch.3 para.1(4)).

65.   Regulation (EU) 910/2014 art.2(3). Later general statements, such as the statement in art.25(2) that "[a] qualified electronic signature shall have the equivalent legal effect of a handwritten signature" must be read subject to the general definition of the scope of the Regulation in art.2(3).

66.   "Signature" is relevant to the formal requirements imposed, inter alia, by the Law of Property (Miscellaneous Provisions) Act 1989 s.1 in relation to deeds (on which see Vol.I, para.1-118); by s.2 of the same Act in relation to contracts for the sale or other disposition of an interest in land (on which see Vol.I, paras 5-010 et seq. and esp. para.5-037); and by the Statute of Frauds s.4 in relation to contracts of guarantee (on which see Vol.II, paras 45-042 et seq. and esp. para.45-057). The position as regards the so-called rule in *L'Estrange v F Graucob Ltd [1934] 2 K.B. 394* which governs the incorporation of written terms by signature (on which see Vol.I, para.13-002) is more arguable as it is not clear that the incorporation of contract terms relates to the "conclusion and validity of contracts or other legal or procedural obligations relating to form" within the exclusion from the scope of the eIDAS Regulation reg.2(3).

67.   See Vol.I, paras 1-113 et seq.

68.   For further discussion of "signature" and electronic communications see Emmet & Farrand on Title (updated to June 2016), paras 2–041—2–041.06.

69.   Law Commission, Land Registration for the Twenty-First Century, A Conveyancing Revolution (2001), Law Com. No.271 and see above, para.1-116.

70.   See Smith, *Property Law*, 8th edn (2014), pp.113–115 discussing the Land Registration Act 2002 ss.91 and 93 and noting that in 2011 the Land Registry halted the e-conveyancing project: Land Registry Annual Report and Accounts 2010–2011, p.26; Megarry and Wade, *The Law of Real Property* 8th edn (2012) by Harpum, Bridge and Dixon, paras 7-157—7-163.

71.   See further Law Commission, Updating the Land Registration Act 2002, A Consultation Paper (Consultation Paper No.227, 2016) Ch.20.

© 2018 Sweet & Maxwell



# Chitty on Contracts 32nd Ed.

## Consolidated Mainwork Incorporating Second Supplement

### Volume I - General Principles

### Part 2 - Formation of Contract

### Chapter 4 - Consideration [1]

### Section 1. - Introduction

**General**

#### 4-001

In English law, a promise is not, as a general rule, binding as a contract unless it is either made in a deed or supported by some "consideration." The purpose of the doctrine of consideration is to put some legal limits on the enforceability of agreements even where they are intended to be legally binding and are not vitiated by some factor such as mistake, misrepresentation, duress or illegality. The existence of such limits is not a peculiarity of English law: for example, in some civil law countries certain promises which in England are not binding for "want of consideration" cannot be enforced unless they are made in some special form, e.g. by a notarised writing. [2] The view was, indeed, at one time put forward in England that consideration was only evidence of the intention of the parties to be bound, and that (at any rate in the case of certain commercial contracts), such evidence could equally well be furnished by writing. [3] But the view that agreements (other than those contained in deeds) were binding without consideration merely because they were in writing was rejected over 200 years ago, [4] though it has been revived as a proposal for law reform. [5] The present position therefore is that English law limits the enforceability of agreements (other than those contained in deeds) by reference to a complex and multifarious body of rules known as "the doctrine of consideration."

**Informal gratuitous promises**

#### 4-002

The doctrine of consideration is based on the idea of reciprocity: that "something of value in the eye of the law" [6] must be given for a promise in order to make it enforceable as a contract. [7] It follows that an informal gratuitous promise does not amount to a contract. [8] A person or body to whom a promise of a gift is made from purely charitable or sentimental motives gives nothing for the promise; and the claims of such a promisee are regarded as less compelling than those of a person who has provided (or promised) some return for the promise. [9] The invalidity of informal gratuitous promises of this kind can also be supported on the ground that their enforcement could prejudice third parties such as creditors of the promisor. [10] Such promises, too, may be rashly made [11]; and the requirements of executing a deed or giving value provide at least some protection against this danger.

**Other promises without consideration**

#### 4-003

The doctrine of consideration, however, also struck at many promises which were not "gratuitous" in any ordinary or commercial sense. These applications of the doctrine were brought within its scope by stressing that consideration must be not merely "something of value," but "something of value *in the eye of the law*." [12] The law in certain cases refused to recognise the "value" of acts or promises even though they would, or might, be regarded as valuable by a lay person. This refusal was based on

many disparate policies; so that "promises without consideration" included many different kinds of transactions which, at first sight, had little in common. [13] It is this fact which is the cause of the great complexity of the doctrine; and which has also led to its occasional unwarranted extensions and hence to demands for reform of the law. [14]

---

1.  Sutton, *Consideration Reconsidered* (1974); Cartwright, *Formation and Variation of Contracts* (2014); Shatwell (1955) 1 Sydney Law Review 289.

2.  See generally, von Mehren (1959) 72 Harv.L.Rev. 1009.

3.  *Pillans v Van Mierop (1765) 3 Burr. 1663.*

4.  *Rann v Hughes (1778) 7 T.R. 350n; 4 Bro.P.C. 27.*

5.  Law Revision Committee, 6th Interim Report, Cmnd. 5449 (1937), para.29; for comments on this and other proposals in the Report, see Lord Wright, *Legal Essays and Addresses*, p.287; Hamson (1938) 54 L.Q.R. 233; Hays (1941) 41 Col.L.Rev. 849; Chloros (1968) 17 I.C.L.Q. 137; Beatson [1992] C.L.P. 1. In many of the United States, writing is (at least for some purposes) regarded as a substitute for consideration: Farnsworth on Contracts, (4th ed.) para.2.18. For a judicial evaluation of the doctrine of consideration, and a discussion of possible alternatives, see *Gay Choon Ing v Loh Sze Ti Terence Peter [2009] SGCA 3 (Singapore Court of Appeal)* at [92]–[118]. In that case, the requirement of consideration was satisfied (see at [80]–[86]).

6.  *Thomas v Thomas (1842) 2 Q.B. 851, 859; Haines v Hill [2007] EWCA Civ 1284, [2008] Ch. 412* at [79], citing para.3-002 of this book in its 29th edition (para.4-002 in the present edition) with apparent approval.

7.  See, for example, *Ashia Centur Ltd v Barber Gillette LLP [2011] EWHC 148 (QB), [2011] Costs L.R. 576* at [20] (solicitors held not to be bound by promise not to charge client for work done after a specified date).

8.  *Re Hudson (1885) 54 L.J. Ch. 811; Re Cory (1912) 29 T.L.R. 18; Williams v Roffey Bros & Nicholls (Contractors) Ltd [1991] 1 Q.B. 1, 19.*

9.  cf. Eisenberg, 85 Cal.L.Rev. 821 (1997).

10. [1]*Eastwood v Kenyon (1840) 11 Ad. & E. 438, 451*. For legislation giving effect to the similar policy of protecting creditors of a gratuitous transferee of property, see Insolvency Act 1986 s.242, applied in *Joint Administrators of Oceancrown Ltd v Stonegale Ltd [2016] UKSC 30, 2016 SC (UKSC) 91* at [17] ("received nothing whatsoever"), approving the judgment in the Court below, quoted in *[2016] UKSC 30* at [13] ("no party paid anything" for the transfer).

11. *Beaton v McDivitt (1988) 13 N.S.W.L.R. 162* at 170. It is often easier to promise to make a gift than actually to make one.

12. See above, at n.6.

13. cf. Corbin, *Contracts*, Vol.I, p.489: "The doctrine of consideration is many doctrines."

14. See above, n.5.

© 2018 Sweet & Maxwell

# Chitty on Contracts 32nd Ed.

## Consolidated Mainwork Incorporating Second Supplement

### Volume I - General Principles

### Part 2 - Formation of Contract

### Chapter 4 - Consideration [1]

### Section 3. - Adequacy of Consideration

**Courts generally will not judge adequacy**

**4-014**

Under the doctrine of consideration, a promise has no contractual force unless *some* value has been given for it. But as a general rule [71] the courts do not concern themselves with the question whether "adequate" value has been given, [72] or whether the agreement is harsh or one-sided. [73] The fact that a person pays "too much" or "too little" for a thing may be evidence of fraud [74] or mistake, or it may induce the court to imply a term as to the quality of the subject-matter or be relevant to the question whether a contract has been frustrated. But it does not of itself affect the validity of the contract, so that (for example) a promise by an employer to make a payment to an employee under a compromise agreement would not be invalid merely because the amount of the payment was irrationally generous. This factor might, indeed, where the employer was a public authority, make such a promise void on the ground that such an authority is "constrained by a general duty arising in public law not to conduct itself in a way which may be described as 'irrationally generous'." [75] But the courts are reluctant to allow such a body to rely on its own irrationality "to escape from the coils of a contractual obligation by suggesting that it could not rationally have signed up to it"; and they have given effect to this reluctance by insisting, not only that the burden on the issue of irrationality rests on the authority, but also that this burden is "a heavy one indeed." [76]

⟦↑⟧ The principle that the courts are not generally concerned with the adequacy of consideration is also recognised by the Consumer Rights Act 2015, by s.62(1) of which "unfair terms" in a "consumer contract", [77] i.e. to one between a "trader" and a "consumer" [78] is "not binding" on the consumer." [79] Our present concern is with s.64(1)(b) [80] by which a term "may not be assessed for fairness under section 62 to the extent that ... the assessment is of the appropriateness of the price payable under the contract by comparison with the goods, digital content or services supplied under it." For contracts made on or after October 1, 2015 [81] this provision will replace reg.6(2)(b) of the Unfair Terms in

Consumer Contracts Regulations 1999, [82] ⟦↑⟧ though the wording of s.64(1)(b) differs in a number of respects from that of reg.6(2)(b) of the 1999 Regulations: in particular reg.6(2)(b) uses the phrase "the adequacy of the price" where s.64(1)(b) refers to "the appropriateness of the price." The Act is thus less clearly linked (than the Regulations are) to the present discussion of adequacy of consideration; but it is arguable that "adequacy" is an aspect, even if it is not the sole aspect, of "appropriateness." To this extent, it remains arguable that a term would not be "unfair" within the Act merely because it required the consumer to pay "too much" for what had been supplied to him under the contract; and that judicial discussions of this point under reg.6(2)(b) [83] can be taken into account in cases concerned with the scope of s.64(1)(b). For example, in *Office of Fair Trading v Abbey National plc* [84] terms in contracts between banks and consumers who were current account holders specified the level of charges payable in respect of unauthorised overdrafts. It was held that these terms were protected from challenge under the 1999 Regulations by reg.6(2)(b); and it seems that they could similarly be protected by s.64(1)(b) of the Act from challenge under its s.62(1). The case is also of interest in the context of the *common law* principle that the law does not normally concern itself with the "adequacy" of consideration. Lord Walker S.C.J. said that "the most important element of the consideration" that was "received by the bank" was "the interest foregone by customers whose accounts are in credit since ... they will be receiving a *relatively low rate of interest* ... " [85]; and Lord

Phillips P. similarly said that such customers "reward the bank by allowing it to use the funds standing to their credit without paying interest *at the market* rate." [86] The phrases here italicised appear to indicate that, where a term was *not* immune from scrutiny by virtue of reg.6(2)(b), then the court could have taken questions of adequacy of consideration into account in assessing the fairness of a term under the 1999 Regulations; and it is submitted that the position is the same under s.64(1)(b) of the 2015 Act. The point is important because, as Lord Walker S.C.J. said, "not every term that is in some way linked to monetary consideration falls within reg.6(2)(b)" [87]: this has, for example, held to be the position where the term in question was "ancillary" to the consumer's principal obligation. [88]

The general common law rule stated above [89] is subject to a number of exceptions discussed elsewhere in this book. [90] These indicate that the courts are (even where legislation has not intervened) by no means insensitive to the problems raised by unequal or unfair bargains; but in none of them is a promise held invalid merely because adequate value for it has not been given. Some additional factor is required to bring a case within one of the exceptions: for example, the existence of a relationship in which one party is able to take an unfair advantage of the other. In the absence of some such factor, the general rule applies that the courts will enforce a promise so long as *some* value for it has been given: "no bargain will be upset which is the result of the ordinary interplay of forces." [91]

**Illustrations**

### 4-015

It follows from the general common law rule stated in para.4-014 above that acts or omissions of very small value can be consideration. Thus it has been said that there was consideration for a promise to give a man £50 "if you will come to my house" [92]; that the act of executing a deed could be consideration for a promise to pay money although the deed was void [93]; that the execution of a will can be consideration (for a promise to make, and not to revoke, a similar will [94]) even though the will is in its nature revocable [95]; that to give up a piece of paper without reference to its contents was consideration, [96] and even that to show a person a document was consideration. [97] The mere act of conducting negotiations can similarly satisfy the requirement of consideration, even though the act does not commit the promisee to bringing the negotiations to a successful conclusion. [98] Further illustrations of the principle are provided by a case in which a promise to cut back undergrowth was regarded as consideration for the grant of a contractual licence to occupy land [99] and by one in which an employee's agreement to submit to a temporary change of workplace and to take part in an assessment of his professional competence was held (though it had no easily quantifiable value) to amount to consideration for his employer's promise not to take disciplinary proceedings against him. [100]

**Objects of trifling value**

### 4-016

In *Chappell & Co Ltd v Nestlé Co Ltd*, [101] chocolate manufacturers sold gramophone records for 1s. 6d. plus three wrappers of their 6d. bars of chocolate. It was held that the delivery of the wrappers formed part of the consideration, though the wrappers were of little value to the buyer and were in fact thrown away by the seller. If the delivery of the wrappers formed part of the consideration it could, presumably, have formed the whole of the consideration, so that a promise to deliver records for wrappers alone would have been binding. This case should be contrasted with *Lipkin Gorman v Karpnale Ltd*, [102] where gaming chips supplied by a gaming club to one of its members (and then lost by the member in the course of the gaming) were held not to constitute consideration for the money which the member had paid for them. One reason for this view appears to have been that "the chips themselves were worthless" [103]; but this is equally true of the wrappers in the *Chappell* case. Another reason seems to have been that the chips "remained the property of the club" [104]; but this again would not of itself be decisive, since it is settled that a transfer of the possession of a thing (no less than that of the ownership of it) can constitute consideration. [105] A third reason for the view that the chips were not consideration for the money may be that the parties did not so regard the transaction: they regarded the chips as merely "a convenient mechanism for facilitating gambling," [106] and the case may be one

in which the court refused to "invent" consideration [107] (by regarding something as consideration which was not so regarded by the parties) even though this course was technically open to it. This refusal appears to have been based on the context in which the question arose. The issue was not whether the club could sue the member on any promise made by him: it arose because the money paid by the member to the club had been stolen; and the club, which had received the money in good faith, argued that it had given valuable consideration for it, so as to defeat the true owner's claim for the return of the money. This explanation of the case derives some support from Lord Goff's discussion of a hypothetical case of tokens supplied by a department store in exchange for cash: he said that "by receiving the money in these circumstances the store does not *for present purposes* give valuable consideration for it." [108] Yet he also accepted that (in the store example) "an independent contract is made for the chips when the customer originally obtains them at the cash desk." [109] The question whether a party has provided consideration may thus receive one answer when it arises for the purpose of determining the enforceability of a promise, and a different and narrower one when it arises for the purpose of determining whether a transaction has adversely affected the rights of an innocent third party. [110] It was the desire to protect the victim of the theft which led the House of Lords in the *Lipkin Gorman* case to reject the, no doubt somewhat technical, argument that the chips constituted consideration for the receipt of the money.

### 4-017

The *Lipkin Gorman* [111] case gives rise to further difficulty because the chips were supplied on the terms that they could be used, not only for gaming, but also to buy refreshments at the club. There was no evidence of their having been used for this purpose, [112] but Lord Templeman said that "neither the power to buy refreshments nor the exercise of that power could constitute consideration for the receipt [by the club] of £154,693." [113] One possible interpretation of this passage is that the supply of refreshments could not constitute consideration for £154,693 (the sum lost by the member of the club) since the disparity in value was too great; but this would be inconsistent with the principle that consideration need not be adequate. It is submitted that the preferable explanation of Lord Templeman's statement is that the chips were simply "treated as currency" [114] in the club and could be used for a variety of transactions. The reason why the supply of refreshments was no consideration for the face value of the chips lost at play was simply that these transactions were entirely separate ones.

**Nominal consideration**

### 4-018

The rule that consideration need not be adequate makes it possible to evade the doctrine of consideration in the sense that a gratuitous promise can be made binding by giving a nominal consideration, e.g. £1 for the promise of valuable property, or a peppercorn for a substantial sum of money. Such cases are merely extreme examples of the rule that the courts will not judge the adequacy of consideration. [115] If, however, it appears on the face of an agreement that the consideration must as a matter of arithmetic be worth less than the performance of the counter-promise, there would seem to be no contract: for example, if A promised to pay B £100 in return for £1 to be simultaneously paid by B to A. It has been said that, in such a case, the apparent contract would amount "in reality to a gift of £99." [116] It is assumed in the example that both sums are simply to be paid in legal tender. An agreement to exchange a specific coin or coins of a particular description for a sum of money greater than their face value (e.g. 20 shilling pieces bearing the date 1900 for £100) would be a good contract. The same would be true of an agreement to pay a sum in one currency in exchange for one payable in another, and of an agreement to pay a larger sum tomorrow in exchange for a smaller sum paid today. In *Birmingham City Council v Forde* [117] it was argued that the reasoning of the hypothetical case discussed above [118] also applied where solicitors (M) had entered into a conditional fee agreement (CFA 1) with a client (C) and then entered into another such agreement (CFA 2) with C by which C promised to pay M more than was due to M under CFA 1. One reason why this argument was, in this context, rejected was that there was a doubt as to the validity of CFA 1. [119] It should be added that the only arguable *arithmetical* disparity in the *Birmingham* case was between *the performances to be rendered by* C under CFA 1 and CFA 2. In this respect, that case differed from our hypothetical case, in which such disparity exists between *promise and counterpromise*. The question in the *Birmingham* case was whether M's promise in CFA 2 to do work which M had already undertaken in CFA 1 was consideration for C's promise of extra

pay and no precise *arithmetical* value could have been placed on the former promise, even on the assumption that there was no doubt as to the validity of CFA 1; and, even if CFA 1 was assumed to have been valid, M's actual performance of the work could have amounted to consideration if it had conferred a factual benefit on C. [120]

### 4-019

⟦I⟧ Where an agreement is legally binding on the ground that it is supported by nominal consideration, the doctrine of consideration does not serve its main purpose, of distinguishing between gratuitous and onerous promises. But the law has no settled policy against enforcing all gratuitous promises. It refuses to enforce only *informal* gratuitous promises [121]; and the deliberate use of a nominal consideration can be regarded as a form used with the intention of making a gratuitous promise binding. In some cases it may, indeed, be undesirable to give promises supported by nominal consideration the same legal effect as promises supported by substantial consideration; but these cases are best dealt with by special rules. [122] Such rules are particularly necessary where the promise can cause prejudice to third parties. For example, the danger that company promoters might use the device of nominal consideration to the prejudice of shareholders is avoided by imposing fiduciary

duties on the promoters. [123]   ⟦I⟧

### Nominal distinguished from inadequate consideration

### 4-020

It is not normally necessary to distinguish between "nominal" and "inadequate" consideration, since both equally suffice to make a promise binding. The need to draw the distinction may, however, arise where rules of law treat promises or conveyances supported only by nominal consideration differently from those supported by consideration which is substantial or "valuable" even though it may be inadequate. [124] One view is that a nominal consideration is one that is of only token value, [125] while an inadequate consideration is one that has substantial value even though it is manifestly less than that of the performance promised or rendered in return. A second view is that " 'Nominal consideration' and 'nominal sum' appear ..., as terms of art, to refer to a sum or consideration which can be mentioned as consideration but is not necessarily paid." [126] This view was expressed by Lord Wilberforce (in a speech with which all the other members of the House of Lords concurred) in *Midland Bank & Trust Co Ltd v Green*. [127] In that case a husband sold a farm, said to be worth £40,000, to his wife for £500. It was held that the wife was, for the purposes of s.13(2) of the Land Charges Act 1925, a "purchaser for money or money's worth" so that the sale to her prevailed over an unregistered option to purchase the land, which had been granted to one of the couple's children. [128] It was not necessary to decide whether the consideration for the sale was nominal but Lord Wilberforce said that he would have had "great difficulty" in so holding; and that "To equate 'nominal' with 'inadequate' or even 'grossly inadequate' consideration would embark the law on inquiries which I cannot think were ever intended by Parliament." [129] On the facts of the case the £500 was paid and was more than a mere token, so that the consideration was not nominal on either of the two views stated above. But if the stated consideration had been only £1, or a peppercorn, it is submitted that it would have been nominal even if it had been paid, or delivered, in accordance with the intention of the parties. So to hold would not lead to inquiries as to the adequacy of consideration; for the distinction between a consideration that is a mere token and one that is inadequate (or even grossly inadequate) is, it is submitted, clear as a matter of common sense. Thus where the question was whether a lease amounted to a "disposition ... for a nominal consideration" [130] it was said that "Any substantial value—that is, a value of more than, say, £5 ... will prevent [the] disposition from being for a nominal consideration." [131] Such an approach gives rise to no more difficulty than the concept of a consideration which is "mentioned as a consideration but ... not necessarily paid." This test would presumably make the question whether consideration was nominal turn on the intention of the parties; and in the present context this would be an even more than usually elusive criterion since no guidance could be obtained from the terms of the contract, those terms being in cases of this kind often deliberately drafted so as to conceal the true nature of the transaction.

### Attitude of equity

**4-021**

Even in equity the validity of a contract could not generally be challenged on the ground that the consideration provided for one party's promise was inadequate.[132] But the equitable remedy of specific performance may be refused on this ground[133] (at least if coupled with certain other factors); and in exceptional cases gross undervalue may even be a ground for more radical forms of equitable relief, such as setting a contract aside or reopening it.[134] Equity also refuses to aid a "volunteer"—so that its remedy of specific performance is not available to a person who has given no substantial consideration but who can nevertheless bring an action on the promise because it is in a deed or supported by nominal consideration.[135] But while the equitable principle restricts the enforceability of gratuitous *promises*, it does not affect the validity of a *completed gift*.[136]

---

1. Sutton, *Consideration Reconsidered* (1974); Cartwright, *Formation and Variation of Contracts* (2014); Shatwell (1955) 1 Sydney Law Review 289.

71. For exceptional cases, see below, paras 4-018, 8-130, 8-142, 27-038. See also *Bankway Properties Ltd v Penfold Dunsford [2001] EWCA Civ 538; [2001] 1 W.L.R. 1369*, where a provision for rent increase in a shorthold tenancy far beyond the amount which (as the landlord knew) the tenant could possibly pay was held to be unenforceable as being inconsistent with the intention of the parties to create an assured tenancy.

72. *Haigh v Brooks (1839) 10 A. & E. 309, 320; Moss v Hall (1850) 5 Exch. 46, 49–50; Westlake v Adams (1858) 5 C.B.(N.S.) 248, 265; Gravely v Barnard (1874) L.R. 18 Eq. 518; Wild v Tucker [1914] 3 K.B. 36, 39; Midland Bank & Trust Co Ltd v Green [1981] A.C. 513, 532;* cf. *Ball v National and Grindley's Bank [1973] Ch. 127, 139; Langdale v Danby [1982] 1 W.L.R. 1123; CCC Films (London) Ltd v Impact Quadrant Films Ltd [1985] Q.B. 16, 27; Brady v Brady [1989] A.C. 755, 775; Normid Housing Association Ltd v R. John Ralphs [1989] 1 Lloyd's Rep. 265, 272; Haines v Hill [2007] EWCA Civ 1284, [2008] Ch. 412* at [79], referring to para.3-014 of this book in its 29th edition (para.4-014 in the present edition) with apparent approval; *Birmingham City Council v Forde [2009] EWHC 12 (QB), [2009] 1 W.L.R. 2732* at [84], [90] (as to which see also below, paras 4-018 and 4-072). cf. Barton (1987) 103 L.Q.R. 118.

73. *Gaumont-British Pictures Corp. v Alexander [1936] 2 All E.R. 1686*. On such facts, provisions of the Consumer Rights Act 2015 cited at nn.77–81 below would not apply.

74. *Tennent v Tennents (1870) L.R. 2 Sc. & Div. 6, 9*. See also *Rice v Gordon (1847) 11 Beav. 265; Cockell v Taylor (1851) 15 Beav. 103.*

75. *Gibb v Maidstone and Tunbridge Wells Health Trust [2010] EWCA Civ 678, [2010] I.R.L.R. 786* at [4]; for a colourful example of such irrationality, see ibid., at [56], discussing *R (Bridgeman) v Drury [1894] 2 I.R. 489.*

76. *Newbold v Leicester CC [1999] I.C.R. 1182*, at [37], where the defendant authority failed to discharge the burden of showing that the generosity was irrational; cf. the *Gibb* case, above n.75, at [7].

77. For the definition of this expression, see the 2015 Act, ss.61(3), 76(1).

78. ibid., s.61(1); for the definitions of "trader" and "consumer", see ibid., s.2(2) and 2(3).

79. 2015 Act, s.62(1).

80. This Act is fully discussed in Vol.II, Ch.38; for its s.64(1)(b) see Vol.II, para.38-368.

81. On the dates of commencement, see s.100 below, Vol.II, para.38-197.

82. SI 1999/2083, replaced by Consumer Rights Act 2015, s.75 and Sch.4, para.34. The object of reg.6(2)(b) was to give effect to the EC Directive on Unfair Terms in Consumer Contracts (93/13/EEC), Art.4(2). For the possible legal status, after the completion of "Brexit", of UK legislation which has been passed to implement EU legal requirements, see above, paras 1-013A—1-013E.

83. See *Director General of Fair Trading v First National Bank plc [2001] UKHL 52, [2002] 1 A.C. 481* at [12], per Lord Bingham, with whose reasoning all the other members of the House of Lords expressed their agreement. Lord Rodger at [64] said that he had "no concluded view" on the present point, relying on the reference in Recital 19 of the Directive cited in n.81 above to "the price/quality ratio." The Recital is not easy to interpret, but at least one possible view is that this ratio is *not* relevant to the fairness of the *price* term (first sentence), though it may be relevant to the fairness of *other* terms of the contract.

84. *[2009] UKSC 6, [2010] 1 A.C. 696*. See also the decision of the ECJ in *Kásler v OTP Jelzálogbank Zrt (C-26/13), [2014] 2 All E.R. (Comm) 443*, discussing art.4(2) of the Directive referred to in n.81 above. That case does not directly deal with the point here under discussion (i.e. the "adequacy of the consideration" point), being mainly concerned (in its discussion of art.4) with the question of what constitutes the "main subject-matter of the contract" within art.4(2) (at [43] and [59]). For a full discussion of this case, see below, Vol.II, paras 38-229 to 38-233.

85. *[2009] UKHL 6* at [42].

86. ibid., at [54].

87. ibid., at [43].

88. A point which Lord Walker illustrated by reference to *Director General of Fair Trading v First National Bank*, above, n.82, where the term in question was one requiring the customer to pay interest on the outstanding amounts even after judgment had been given against him for this principal sum. It was held that this term was not protected from challenge by reg.6(2)(b), though the challenge failed as the term was held not to be unfair.

89. At n.72.

90. See above, n.71; and Waddams (1976) 39 M.L.R. 393; Tiplady (1983) 46 M.L.R. 601.

91. *Lloyd's Bank Ltd v Bundy [1975] Q.B. 326, 336,* per Lord Denning, M.R.

92. *Gilbert v Ruddeard (1608) 3 Dy. 272b (n)*; cf. *Denton v G.N. Ry. (1856) 5 E. & B. 860*.

93. *Westlake v Adams (1858) 5 C.B.(N.S.) 248*; perhaps there was also an element of compromise in this case.

94. If such promises are contractually binding, they can be enforced under the doctrine of mutual wills even where the promise sought to be so enforced is established by evidence extraneous to the will: *Charles v Fraser [2010] EWHC 2154 (Ch), [2010] W.T.L.R. 1489*.

95. *Re Dale [1994] Ch. 31*. cf. *Re Goodchild [1997] 1 W.L.R. 1216* where a mere "common understanding" (as opposed to definite mutual promises) did not suffice to make B's promise irrevocable, but some effect to it was given by an order in favour of the intended beneficiary under the Inheritance (Provision for Dependants) Act 1975; *Taylor v Dickens [1998] 1 F.L.R. 806*, the reasoning of which was doubted on other grounds in *Gillett v Holt [2001] Ch. 210*.

96. *Haigh v Brooks (1839) 10 A. & E. 309, 334*; cf. *Foster v Dawber (1861) 6 Ex. 839*; *Aspinall's Club Ltd v Al Zayat [2007] EWCA Civ 1001* at [30].

97. *Sturlyn v Albany (1587) Cro.Eliz. 67*; *March v Culpepper (1628) Cro.Car.70*; contrast *Re Charge Card Services [1987] Ch. 150, 164*, affirmed *[1989] Ch. 487* (production of charge card

and signature of voucher not consideration for a supply of goods, evidently because such "consideration" would be blatantly "invented": cf. above, para.4-010).

98. *Sepoong Engineering Construction Co Ltd v Formula One Management Ltd [2000] 1 Lloyd's Rep. 602, 611.*

99. *Well Barn Farming Ltd v Backhouse [2005] EWHC 1520, [2005] 3 E.G.L.R. 109* at [45].

100. *Palmer v East & North Herefordshire NHS Trust [2006] EWHC 1997, [2006] Lloyd's Rep. Med 472.*

101. *[1960] A.C. 87.*

102. *[1991] 2 A.C. 548.* On facts such as those of this case, consideration for the money paid by the member to the club would now be provided by reason of the fact that the club's promise to the member would be legally enforceable by virtue of s.335(1) of the Gambling Act 2005: Vol.II, para.41-011. But the question whether tokens of very small intrinsic value can constitute consideration can still arise in other contexts, not connected with gambling: see below at n.107.

103. *[1991] 2 A.C. 548* at 561.

104. ibid.; and see 575.

105. *Bainbridge v Firmstone (1838) 8 A. & E. 743;* below, para.4-198.

106. *Lipkin Gorman* case above, n.101 at 575. The reasoning of the *Lipkin Gorman* case on this point continues to apply after the coming into force of the Gambling Act 2005: see *Ritz Hotel Casino Ltd v Al Daher [2014] EWHC 2847 (QB)* at [31]–[32], below, Vol.II, para.41-042 at n.255.

107. Above, para.4-010.

108. *Lipkin Gorman* case above, n.101 at 577; italics supplied; cf. below, para.4-032.

109. *Lipkin Gorman* case above, n.101 at 576.

110. Above, para.4-002.

111. *[1991] 2 A.C. 548.*

112. *Lipkin Gorman* case above, n.110 at 569.

113. ibid. at 567. For the effect of s.335(1) of the Gambling Act 2005 on the reasoning of the *Lipkin Gorman* case, see above, para.4-016 n.101.

114. *Lipkin Gorman* case above, n.110 at 561.

115. Atiyah, *Essays on Contracts,* p.194 argues that there is no logical connection between the two rules, relying on the fact that in many of the United States the courts recognise the principle that consideration need not be adequate, while rejecting the device of nominal consideration. The answer to this argument lies in Holmes' aphorism (The Common Law, p.1) that "life of the law has not been logic: it has been experience." American courts which reject the device of nominal consideration do so on policy grounds which have nothing to do with logic.

116. *Birmingham City Council v Forde [2009] EWHC 12, [2009] 1 W.L.R. 3732* at [90].

117. Above, n.115.

118. After n.114, above.

119. See para.4-072 below.

120. See para.4-069 below.

121. See above, para.4-002.

122. Thus a nominal consideration was disregarded in *Milroy v Lord (1862) 4 D.F. & J. 264*, discussed below, para.19-035; specific performance will not be ordered of a promise supported by only nominal consideration (below, para.27-039) and for the purposes of the Law of Property Act 1925, "valuable consideration does not include a nominal consideration in money": s.205(1)(xxi).

123. ⬚Below, para.10-054. For other ways of protecting third parties from being prejudiced by promises made for inadequate consideration, see Trustee Act 1925, s.13; Law of Property Act 1925, ss.172, 173; Local Government Act 1972, s.123, considered in *R. v Pembrokeshire CC Ex p. Coker [1999] 4 All E.R. 1007*, *Structadene Ltd v Hackney LBC [2001] 2 All E.R. 225*, discussing s.123(2) of the 1972 Act, restricting disposals by local authorities "for a consideration less than the best that can reasonably be obtained" and *R. (On the application of Salford Estates) v Salford City Council [2011] EWHC 2135 (Admin), [2011] B.L.G.R. 982*, discussing the scope of the local authority's duty under that provision; Inheritance (Provision for Family and Dependants) Act 1975, ss.10(2)(b), 10(5)(b), 11(2)(c); Insolvency Act 1986, ss.238, 239, 423 (applied in *Barclays Bank plc v Eustice [1995] 1 W.L.R. 1238*; *Agricultural Mortgage Corp. plc v Woodward [1995] B.C.L.C. 1*); *Phillips v Brewin Dolphin Bell Lawrie Ltd [2001] UKHL 2, [2001] 1 W.L.R. 143*; *Bataillon v Shone [2016] EWHC 1174 (QB), [2016] B.P.I.R. 829* (transfers from husband to wife at an undervalue set aside as having been made for "no consideration" within s.429(1)(a) of the Insolvency Act 1986). cf. Companies Act 2006, ss.190, 593. See also Charities Act 2011, ss.197(2)(a) and 218(3), requiring "full consideration in money or money's worth" (a similar requirement, previously contained in s.65(1)(a) of the Charities Act 1993, now repealed by s.354 and Sch.10 of Charities Act 2011, was held not to have been satisfied in *Bayoumi v Women's Total Abstinence Educational Union Ltd [2003] EWCA Civ 1548 [2004] Ch. 40 at [46]–[47]*).

124. Above, para.4-018 at nn.121 and 122.

125. This seems to be the sense in which 10 shillings was described as "nominal" consideration (for the assignment of a debt) in *Turner v Forwood [1951] 1 All E.R. 746*.

126. *Midland Bank & Trustee Co Ltd v Green [1981] A.C. 513, 532*.

127. above n.125.

128. For later successful proceedings by that child against the parents for conspiracy, see [1982] Ch. 529.

129. *[1981] A.C. 513, 532*. In other legislative contexts such an inquiry may be intended: e.g. by use of the phrase "full and valuable consideration" in the Inheritance (Provisions for Family and Dependants) Act 1975, s.1(3); cf. Charities Act 2011, ss.197(2)(a) and 218(3), above n.122.

130. Within Law of Property Act 1925, s.84(7).

131. *Westminster City Council v Duke of Westminster [1991] 4 All E.R. 136, 146 (reversed in part on another ground (1992) 24 H.L.R. 572)*.

132. See, e.g. *Cheale v Kenward (1858) 3 De G. & J. 27*; *Townsend v Toker (1866) L.R. 1 Ch. App. 446*.

133. Below, para.27-038.

134. Below; para.8-130; *Pennell v Miller (1857) 23 Beav. 172*; *Butler v Miller (1867) L.R. 1 Eq. 195, 210*; *Tennent v Tennents (1870) L.R. 2 Sc. & Div. 6, 9*.

135.  *Jefferys v Jefferys (1841) Cr. & Ph. 138*; below, para.27-039.

136.  *T. Choithram International S.A. v Pagarani [2001] 1 W.L.R. 1*; *Pennington v Waine [2002] EWCA Civ 227*; *[2002] 1 W.L.R. 2075.*

© 2018 Sweet & Maxwell



# Chitty on Contracts 32nd Ed.

## Consolidated Mainwork Incorporating Second Supplement

## Volume I - General Principles

## Part 7 - Performance and Discharge

## Chapter 21 - Performance

## Section 4. - Payment

## (a) - In General

**Payment**

### 21-040

All questions relating to payment of a sum of money in pursuance of a contract depend on the construction of the terms of the contract. [237] The creditor is entitled to require the payment to be made in legal currency. [238] The parties, however, may by subsequent variation, [239] waiver [240] or novation [241] substitute a different obligation from that originally undertaken, so that the original obligation of the debtor to make payment is varied or discharged. An illustration of such a discharge is a settlement of accounts, by which items on one side are agreed to be set off against items on the other side: if the two sides then balance, this is equivalent to payment on both sides [242]; if there is a balance on one side, which is paid in cash, this is likewise equivalent to payment of all sums on both sides. [243] Similarly, payment of a debt may be satisfied by the creditor agreeing to take goods in lieu of cash, [244] or to accept the method of charging the debt to a third party through the debtor's credit card, [245] or by both parties agreeing that a transfer in a banker's books from the debtor's account to the creditor's account shall amount to payment. [246] Payment of wages to a workman, however, must either be in current coin of the realm, or comply with statutory provisions. [247] An obligation to pay money can be frustrated. [248] Payment by negotiable instrument is examined below. [249]

**Distinction between claims for payment of a debt and claims for damages. [250]**

### 21-041

There is an important distinction between a claim for payment of a debt and a claim for damages for breach of contract. A debt is a definite sum of money fixed by the agreement of the parties as payable by one party in return for the performance of a specified obligation by the other party or on the occurrence of some specified event or condition [251]; whereas, damages may be claimed from a party who has broken his primary contractual obligation in some way other than by failure to pay such a debt. (It is also possible that, in addition to a claim for a debt, there may be a claim for damages in respect of consequential loss caused by the failure to pay the debt at the due date.) [252] The relevance of this distinction is that rules on damages do not apply to a claim for a debt, [253] e.g. the claimant who claims payment of a debt need not prove anything more than its performance or the occurrence of the event or condition; there is no need for it to prove any actual loss suffered by it [254] as a result [255] of the defendant's failure to pay; the whole concept of the remoteness of damage [256] is therefore irrelevant; the law on penalties does not apply to the agreed sum [257]; and the claimant's duty to mitigate its loss does not generally apply. [258]

**Payment by agent or third party**

### 21-042

Where payment of a debt is made by a third person who is not jointly [259] liable (e.g. as co-contractor), the debt is not discharged unless the payment is made by the third person as agent for and on account of the debtor, and with his prior authority or subsequent ratification. [260] Even after the creditor has sued for the debt, the debtor can ratify such a payment by pleading payment. [261] Where payment is made by a third person on behalf of the debtor but without his authority, the creditor and the person who made the payment may together rescind the transaction at any time before the debtor has ratified the payment; the creditor may repay the money to the third person and thereupon the payment is at an end, so that the debtor cannot later purport to ratify the payment; the debtor therefore becomes again responsible. [262] The payment of a debt by one of a number of joint (or joint and several) debtors discharges all the debtors. [263]

**Payment to a third party**

### 21-043

If the creditor requests the debtor to pay the debt to a third party, such a payment is equivalent to payment direct to the creditor, and is a good discharge of the debt. [264]

**Payment to agent**

### 21-044

If payment is made to an agent of the creditor, this discharges the debt if it is made in the ordinary course of business, before the creditor demands payment to himself, [265] and while the agent has actual or ostensible authority from the creditor to receive the payment. [266] Payment to an ostensible agent, who is in fact without actual authority to receive the payment, is a valid discharge of the debt, e.g. where money is paid to a person apparently entrusted with the conduct of the creditor's business. [267] There is no general rule that an agent who is authorised to sell on behalf of his principal is also authorised to receive the purchase-money. [268] A solicitor has implied authority to receive payment of a debt for which he is instructed to sue [269]; he also has authority to receive the consideration money for a deed when he produces it, if it contains a receipt for such money and is duly executed by the person entitled to give a receipt for the money. [270]

**Payment to agent otherwise than in cash**

### 21-045

The creditor's right to payment is not affected by a set-off which his debtor may have against the creditor's agent [271] unless this mode of dealing is sanctioned by a usage known to the creditor, [272] or the creditor allowed his agent to sell as apparent principal. [273] Nor can the debtor discharge his debt to the creditor by writing off a debt due to the debtor from the creditor's agent. [274] Prima facie, an agent who is authorised to receive payment (e.g. an auctioneer) has authority only to receive it in cash [275]; such an agent cannot bind his principal by accepting a bill of exchange without the express authority of the principal. [276] If such an agent in fact accepts a cheque and cashes it, or the proceeds are collected by his bank, that amounts to a payment in cash. [277] On the other hand, a principal who desires to authorise an agent to receive payment by cheque only and not in cash must plainly notify third parties dealing with his agent of the exact extent of the agent's authority; thus a notification that cheques drawn in payment must be drawn in a particular form does not exclude the presumption that payment may lawfully be made to the agent in cash and not by cheque at all. [278]

**Payment or transfer into a bank account. [279]**

### 21-046

Where the creditor instructs the debtor to pay a sum due to him by making a payment to the credit of a specified bank account, the creditor has made the bank his agent to receive the payment, which is

made as soon as the bank receives payment in cash, or by means of a banker's cheque, [280] draft, payment order or transfer which is treated by banks as equivalent to cash. [281] When the contract requires "payment in cash" to be made into the payee's bank account, but the parties obviously do not expect the payment to be literally in cash (i.e. in pounds sterling, dollar bills or other legal tender), the payment or credit to the payee's account must be "the equivalent of cash, or as good as cash", [282] that is, by:

> "… any commercially recognised method of transferring funds the result of which is to give the transferee the [unfettered or unrestricted] right to the immediate use of the funds transferred." [283]

Thus, where a Telex credit transfer was made to the payee's bank account, and was treated as irrevocable under an Italian inter-bank scheme, but interest on the funds credited would not begin to run in favour of the payee until four days later, the House of Lords held [284] that "payment in cash" had not been made by the book entry of the receiving bank. "Payment in cash" meant that the payee whose account was credited must be able to use it immediately, e.g. by immediate transfer to a deposit account where it would earn interest; the fact that the receiving bank would allow the payee immediately to draw on the credit, but subject to his paying interest during the four days, did not make it equivalent to cash, since that arrangement was merely the equivalent of an overdraft facility. [285]

**Payment "in cash"**

## 21-047

The point of time at which a transfer or credit payment into a bank account is "made" has been discussed, but not finally decided, in another House of Lords case, [286] where "payment in cash" was required by the contract. The payment was made by a payment order from another bank, under the provisions of an inter-bank settlement scheme, where the system of processing might have taken 24 hours before the payee's account was credited. Lord Salmon, without deciding the point:

> "… inclined to think that … there is no real difference between a payment in dollar bills and a payment by payment orders which in the banking world are generally regarded and accepted as cash" [287]

(which view Lord Russell was also inclined to accept [288]); but Lord Fraser thought that the payment must be made "in sufficient time to allow for the period of processing normally required for the method of payment they had chosen". [289]

**Payment by "in-house" transfer**

## 21-048

In the case of "in-house" payments (viz, a transfer from one customer's account to another's within the same bank), the payment is made as soon as the bank accepts the payer's instructions and credits the payee's account; in other words, the payment is "made" as soon as the bank has set in motion the bank's internal process for crediting the payee's account (e.g. by preparing the instructions for the bank's computer) and before the payee receives any notice that this has been done. [290] Thus, where a bank received a Telex instruction (or "transfer order") from a customer to debit his account and to credit another customer's account, the payment was made when the staff of the bank accepted the instruction and marked the appropriate documents in the bank. [291]

**Payment in "freely transferable funds"**

## 21-049

In the case where payment must be made "in freely transferable funds" the payment will normally be made when the funds are freely available in the hands of the recipient and this will not normally be the case until the funds have been credited to the account specified for receiving payment so that the payee has control over the money following payment. [282]

### Where payment must be to an agent

## 21-050

There may be cases where payment must be made to the agent, and cannot validly be made to the principal, e.g. where an auctioneer has an unsatisfied lien on the proceeds of goods sold by him, it is no defence to an action by him for the price [283] that the buyer had paid the principal, unless the contract of sale permitted payment direct to the principal. [284] The same rule applies where the auctioneer has acted on the faith of an agreement between himself and the principal that the proceeds of the sale shall be disposed of in a particular way. [285] The buyer may rely upon any defence or set-off that he may have against the principal in respect of that part of the amount claimed by the auctioneer which, if recovered, he would be bound to hand over to the principal. [286]

### Payment to joint creditors, partners, trustees, etc

## 21-051

The payment of a debt to one of a number of joint creditors discharges a debt owed to them jointly. [287] Similarly, as partnership is founded on agency, payment to one of a number of partners to whom a debt is jointly owed binds them all, even after a dissolution of the partnership: this position holds even where the debtor had notice before payment that the partners had appointed a third person to collect the debts due to the firm, unless there is something in the notice which expressly takes away the right of the one partner to receive the money. [288] Payment of a debt to one of two trustees is a good discharge as to both. [289] But where bankers pay to one of several trustees money which should be held in their joint account, the bankers are not discharged as against the other trustees unless they authorised such payment [290]; for where money is paid into a bank on the joint account of persons who are not partners, the bankers are not discharged by payment to one of those persons without the authority of the others. [291] Payment of a debt to one of several executors or administrators is a good discharge [292]; and by the Administration of Estates Act 1925 s.27(2), where a representation [293] is revoked all payments and dispositions made in good faith to a personal representative [294] before the revocation are a valid discharge to the person making the same. [295]

### Bankruptcy

## 21-052

Payments made to a bankrupt before the date of the bankruptcy order are considered in Ch.20. [296] The trustee in bankruptcy is empowered to give receipts for any money received by him, which receipts "effectually discharge the person paying the money from all responsibility in respect of its application". [297]

### Payment under a third party debt order. [298]

## 21-053

Under CPR Pt 72, the court may, upon the application of a judgment creditor make an order (known as a "final third party debt order") which requires a third party to pay to the judgment creditor the amount of any debt due or accruing to the judgment debtor from the third party or so much of that

debt as is sufficient to satisfy the judgment debt and the judgment creditor's costs of the application. However, a court cannot make a final third party debt order without first making an "interim third party debt order". [309] A final third party debt order is enforceable as an order to pay money. [310] If the third party pays money to the judgment creditor in compliance with a third party debt order or the order is enforced against the third party, the third party shall, to the extent of the amount paid by it or realised by enforcement against it, be discharged from its debt to the third party [311] and this is so even if the third party order, or the original judgment or order against the judgment debtor, is later set aside. [312]

**Amount to be paid**

### 21-054

Apart from subsequent variation by agreement, [313] accord and satisfaction [314] or the operation of promissory estoppel, [315] the payment of part of a liquidated sum of money due to the creditor is not a discharge of the whole debt, [316] even though the creditor purports to release the remaining obligation, since there is no consideration for the release. [317] If there is no liquidated sum due, and the amount is uncertain or disputed, payment of any sum subsequently agreed upon by the parties will constitute an accord and satisfaction. [318]

**Time of payment**

### 21-055

The time when payment is due to be made is a question of construction of the contractual terms. [319] Sometimes the time for payment must be implied from the circumstances of the contract: thus, where the claimant contracts to work upon the defendant's materials, and no time is fixed for payment of the agreed cost, the defendant must pay as soon as the claimant has completed the work and given the defendant a reasonable opportunity of seeing that the work has been properly done. [320] Money which is repayable on demand must be ready to be handed over to the creditor as soon as the creditor demands it from the debtor: the only time which the creditor needs to give the debtor is time to get the money from some convenient place, [321] not time in which to negotiate a deal or a loan which he hopes will produce the money. [322] The rules discussed above [323] as to exact compliance with the time fixed for performance of the contract apply to the time fixed for payment. It is therefore only in three cases recognised by equity [324] that a failure to make the payment on the fixed date amounts to a repudiatory breach of contract entitling the other party to terminate the contract. By s.10(1) of the Sale of Goods Act 1979, it is expressly enacted that unless a different intention appears from the terms of a contract for the sale of goods, stipulations as to time of payment are not of the essence of the contract. [325]

**Place of payment**

### 21-056

[1] Where the place of payment is specified by the contract, the debtor must tender payment at that place in order to discharge his obligation. [326] Where no place of payment is expressly or impliedly specified by the contract, the general rule is that it is the debtor's duty to seek the creditor in order to

pay the creditor at the creditor's place of business or residence, if it is in England [327]  [1]; but the rule is not applicable to large employers of labour who maintain a regular pay-day and pay office. [328] Unless there is evidence of a contrary intention, the place for payment of a debt is the business place or residence of the creditor at the date when the debt was contracted. [329] If the contract specifies alternative places for payment, it is the duty of the party entitled to select the place to notify the other party; if it is for the creditor to select, there is no default in payment until the creditor notifies the debtor which place of payment the creditor selects. [330]

**Mode of payment**

### 21-057

Except where the creditor has expressly or impliedly agreed to do so, the creditor is under no obligation to accept a negotiable instrument (such as a bill, note or cheque) in payment of the debt. [331] If the creditor does accept payment in this way, the effect upon the existence of the debt depends on the circumstances, and is discussed in detail in a separate section. [332]

#### Loss in post

### 21-058

Where a banknote, a cheque or other negotiable instrument is sent to the creditor by post, this does not normally amount to payment if it is lost in the post. [333] Where, however, a creditor expressly or impliedly authorises its debtor to transmit the amount of the debt by cheque through the post, the debtor is discharged if it complies with the authority by sending the cheque in a letter properly addressed to the creditor, even though it does not reach the creditor. [334] The necessary authority is not to be implied from the mere fact that the previous course of dealing between the parties has been to send cheques by post, [335] though very little evidence of authority is required in addition to evidence of such a course of dealing. A request for a remittance by post amounts to an authority to send the sum in question by post in such a form as is appropriate to its amount. To send (in 1916) a sum as large as £48 in banknotes, even in a registered letter, was held to be unusual and inappropriate [336] and so was the sending by post of an uncrossed bearer cheque. [337]

#### Expressly or impliedly authorised mode

### 21-059

A particular mode of payment may be expressly or impliedly authorised by the contract [338]: thus where there is an automatic slot gas meter, payment is effectively made when coins are placed in the meter, as this is the mode of payment authorised by the supplier of the gas; if the money is subsequently stolen without the negligence of the payer, he is not liable. [339] A court may be willing to draw an inference that payment can be made by cheque and this inference may be drawn on the basis of the previous course of dealing between the parties [340] or even from the fact that the parties live at a distance from each other. [341] Similarly, payment by credit or charge card may be a method of payment accepted by the creditor. [342] In a contract for the self-service supply of petrol, the garage undertakes to accept a particular charge card in payment if it displays a notice of its willingness to do so. [343]

#### Proof of payment: receipts

### 21-060

A payment may be proved by any evidence [344] but the usual method of proof is the production of a receipt [345] signed by the creditor or the creditor's agent. A receipt is not conclusive but only prima facie evidence that the money has been paid. [346] Evidence may be given of the intention with which it was handed over [347] and of the circumstances generally [348]: thus a receipt given "in full discharge" does not exclude an implied agreement to pay interest not covered by the receipt. [349] Again, the effect of a receipt may be destroyed by proof that it was obtained by fraud or under a mistake of fact, [350] or that it formed part of a transaction which was merely colourable, because no money had in fact been paid. [351] Where, however, a document containing a receipt clause is relied on by third parties, different considerations prevail, and the person signing the document may be estopped, as against third parties, from denying receipt of the money. [352] A receipt may be in any form so long as the words are express. [353] A receipt for consideration money or securities in the body of a deed is a sufficient discharge for the same, without any further receipt being indorsed on the deed. [354] It is no longer necessary for a receipt to be stamped. [355]

237. *Re Charge Card Services Ltd [1989] Ch. 497; Kaupthing Singer & Friedlander Ltd v UBS AG [2014] EWHC 2450 (Comm)* at [64]. See Charles Proctor, *Goode on Payment Obligations in Commercial and Financial Transactions* 2nd edn (2009). On questions of payment due in a foreign currency, see below, paras 30-332, 30-371—30-381.

238. See below, para.21-088.

239. See below, paras 22-032 et seq.

240. See below, paras 22-040 et seq.

241. See below, para.22-031.

242. *Re Harmony and Montague Tin and Copper Mining Co (1873) L.R. 8 Ch. App. 407, 414*. See also *Livingstone v Whiting (1850) 15 Q.B. 722*.

243. *Callander v Howard (1850) 10 C.B. 290; Re Harmony and Montague Tin and Copper Mining Co (1873) L.R. 8 Ch. App. 407; Larocque v Beauchemin [1897] A.C. 358; North Sydney Investment and Tramway Co Ltd v Higgins [1899] A.C. 263*. Where items are on one side only there is no such settlement of accounts: *Perry v Attwood (1856) 6 E. & B. 691*.

244. *Hands v Burton (1808) 9 East 349; Saxty v Wilkin (1843) 11 M. & W. 622; Smith v Battams (1857) 26 L.J. Ex. 232*.

245. See below, para.21-084.

246. *Bodenham v Purchas (1818) 2 B. & Ald. 39*. See the discussion, below, para.21-046.

247. See Vol.II, paras 40-095—40-096.

248. *Libyan Arab Foreign Bank v Bankers Trust Co [1989] Q.B. 728, 749* but note the criticisms levelled against this proposition by Mann, *The Legal Aspect of Money*, 5th edn, pp.68 and 418. The current edition of Mann, 7th edn (2012), para.3.05 n.9, notes that it is "not quite an accurate statement" to suggest that a monetary obligation cannot be frustrated, and suggests that monetary obligations are capable of frustration.

249. See below, paras 21-075 et seq.

250. See below, para.26-008; *Jervis v Harris [1996] Ch. 195, 206–207*. Payment in full of a debt extinguishes the creditor's cause of action: *Edmunds v Lloyd's Italic, etc. SpA [1986] 1 W.L.R. 492, 495*. (On interest, see below, paras 26-227—26-246.)

251. See below, para.26-008 n.49.

252. See *Trans Trust SPRL v Danubian Trading Co Ltd [1952] 2 Q.B. 297; Wadsworth v Lydall [1981] 1 W.L.R. 598*; see generally, below, paras 26-175—26-193.

253. See below, para.26-008, for a fuller discussion of these and other distinctions.

254. See below, paras 26-001, 26-009.

255. On causation, see below, paras 26-058 et seq.

256. See below, paras 26-107 et seq.

257. See below, para.26-178.

258. See below, para.26-079.

259. Or jointly and severally liable. On joint liability, see above, paras 17-001 et seq.

260. *James v Isaacs (1852) 12 C.B. 791; Simpson v Eggington (1855) 10 Exch. 845, 847; Lucas v Wilkinson (1856) 1 H. & N. 420; Walter v James (1871) L.R. 6 Ex. 124; Purcell v Henderson (1885) 16 L.R.Ir. 213, 223, 224; Keighley, Maxsted & Co v Durant [1901] A.C. 240; Re Rowe [1904] 2 K.B. 483; Smith v Cox [1940] 2 K.B. 558; Owen v Tate [1976] 1 Q.B. 402. Pacific Associates Inc v Baxter [1990] 1 Q.B. 993, 1033–1034; Pacific and General Insurance Co Ltd v Hazell [1997] L.R.L.R. 65, 79–80; Ibrahim v Barclays Bank Plc [2012] EWCA Civ 640, [2013] Ch. 400.* See below, para. 29-121, and Vol.II, paras 31-027—31-034, especially para.31-034; Birks and Beatson (1976) 92 L.Q.R. 188. cf. Burrows, *The Law of Restitution*, 3rd edn (2011), pp.460–468 and Friedmann (1983) 99 L.Q.R. 534. The authority of the debtor will often be presumed: see *Bennett v Griffin Finance [1967] 2 QB 46* (Vol.II, para.39-329) and below, paras 29-119—29-125.

261. *Belshaw v Bush (1851) 11 C.B. 191.*

262. *Walter v James (1871) L.R. 6 Ex. 124, 128.*

263. See above, para.17-014.

264. *Roper v Bunford (1810) 3 Taunt. 76; Page v Meek (1862) 32 L.J.Q.B. 4;* cf. *Commercial Bank of Australia Ltd v Wilson & Co's Estate [1893] A.C. 181.* On payment into the creditor's bank account, see below, para.21-046; on payment by credit or charge card, see below, para.21-084.

265. *Sanderson v Bell (1834) 2 C. & M. 304.*

266. See Vol.II, paras 31-043—31-050.

267. *Barrett v Deere (1828) Moo. & M. 200; Wilmott v Smith (1828) Moo. & M. 238; Bocking Garage v Mazurk [1954] C.L.Y. 14.* The claimant's wife may be so authorised: *Offley v Clay (1840) 2 M. & G. 172.* cf. *Galbraith and Grant Ltd v Block [1922] 2 K.B. 155* (delivery of goods at buyer's premises to a person having ostensible authority to receive them).

268. *Drakeford v Piercy (1866) 7 B. & S. 515; International Sponge Importers Ltd v Andrew Watt & Sons [1911] A.C. 279; Linck, Moeller & Co v Jameson & Co (1885) 2 T.L.R. 206; Butwick v Grant [1924] 2 K.B. 483.* Custom, however, may affect the agent's authority: *Catterall v Hindle (1867) L.R. 2 C.P. 368* (broker).

269. *Yates v Freckleton (1781) 2 Dougl. 623; Weary v Alderson (1837) 2 M. & Rob. 127* (implied authority to receive payment extends to solicitor's London agent who issues the writ).

270. Law of Property Act 1925 s.69; *King v Smith [1900] 2 Ch. 425.*

271. *Bartlett v Pentland (1830) 10 B. & C. 760; Barker v Greenwood (1837) 2 Y. & C. Ex. 414; Pearson v Scott (1878) 9 Ch. D. 198; Anderson v Sutherland (1897) 2 Com. Cas. 65; Matvieff v Crossfield (1903) 8 Com. Cas. 120.*

272. *Scott v Irving (1830) 1 B. & Ad. 605; Stewart v Aberdein (1838) 4 M. & W. 211; Sweeting v Pearce (1861) 9 C.B.(N.S.) 534; Catterall v Hindle (1867) L.R. 2 C.P. 368.*

273. *Cooke & Sons v Eshelby (1887) 12 App. Cas. 271; Ex p. Dixon (1876) 4 Ch. D. 133* (factor selling in his own name); *Borries v Imperial Ottoman Bank (1873) L.R. 9 C.P. 38;* see Vol.II, para.31-069; cf. *Greer v Downs Supply Co [1927] 2 K.B. 28.*

274. *Underwood v Nicholls (1855) 17 C.B. 239; Pearson v Scott (1878) 9 Ch. D. 198.*

275. *Sweeting v Pearce (1861) 9 C.B.(N.S.) 534, 540; Blumberg v Life Interests and Reversionary Securities Corp [1897] 1 Ch. 171. [1898] 1 Ch. 27.* Such an agent has no authority to receive payment in other goods: *Howard v Chapman (1831) 4 C. & P. 508;* nor is a credit to the agent payment to his principal: *Crossley v Magnac [1893] 1 Ch. 594.* See also Vol.II, para.31-051.

276. *Sykes v Giles (1839) 5 M. & W. 645; Williams v Evans (1866) L.R. 1 Q.B. 352; Hogarth v Wherley (1875) L.R. 10 C.P. 630.*

277. *Bridges v Garrett (1870) L.R. 5 C.P. 451; Charles v Blackwell (1877) 2 C.P.D. 151; Walker v Barker (1900) 16 T.L.R. 393; Robinson v Marsh [1921] 2 K.B. 640, 644; Clay Hill Brick & Tile Co Ltd v Rawlings [1938] 4 All E.R. 100; cf. Pape v Westacott [1894] 1 Q.B. 272* (cheque dishonoured).

278. *International Sponge Importers Ltd v Watt & Sons [1911] A.C. 279; cf. Bradford & Sons v Price Bros (1923) 92 L.J.K.B. 871.*

279. Charles Proctor, *Goode on Payment Obligations in Commercial and Financial Transactions*, 2nd edn (2009), paras 4–09 et seq. See also King (1982) 45 M.L.R. 369; and below, Vol.II, paras 34-425 et seq.

280. On receipt of the debtor's own cheque, or other negotiable instrument, as conditional payment, see below, para.21-076.

281. *A/S Awilco of Oslo v Fulvia SpA Di Navigazione of Cagliari (The Chikuma) [1981] 1 W.L.R. 314* (see Vol.II, para.34-430); *The Brimnes (Tenax S.S. Co Ltd v The Brimnes (Owners)) [1975] Q.B. 929, 948, 964–965, 968–969; Razcom CI v Barry Callebaut Sourcing AG [2010] EWHC 2598 (QB)* at [21]–[25].

282. *The Chikuma [1981] 1 W.L.R. 314, 320.*

283. *The Brimnes [1973] 1 W.L.R. 386, 400* (approved by the House of Lords in *The Chikuma [1981] 1 W.L.R. 314, 318–320*, with the substitution of "unfettered or unrestricted" for "unconditional" as the adjective before "right"). The decision of the Court of Appeal in *The Brimnes is reported at [1975] Q.B. 929.*

284. *The Chikuma [1981] 1 WL.R. 314.*

285. *[1981] 1 W.L.R. 314.* (But see the criticism by Mann (1981) 97 L.Q.R. 379.)

286. *Mardorf Peach & Co Ltd v Attica Sea Carriers Corp of Liberia [1977] A.C. 850.*

287. *[1977] A.C. 850, 880.*

288. *[1977] A.C. 850, 889.*

289. *[1977] A.C. 850, 885.* (The other Lords did not deal with this point.) See also *Afovos Shipping Co SA v Romano Pagnan and Pietro Pagnan [1983] 1 W.L.R. 195, 202, 204.*

290. *Momm v Barclays Bank International Ltd [1977] Q.B. 790* (following *The Brimnes [1973] 1 W.L.R. 386;* and *Eyles v Ellis (1827) 4 Bing. 112*); *Royal Products Ltd v Midland Bank Ltd [1981] 2 Lloyd's Rep. 194.*

291. *The Brimnes [1975] Q.B. 929, 948–951, 963–966, 969.* (The mere receipt of the Telex message does not constitute payment, since it is not a negotiable instrument: 949, 965, 969.)

292. *Kaupthing Singer & Friedlander Ltd v UBS AG [2014] EWHC 2450 (Comm)* at [68].

293. An auctioneer's special property in the goods entrusted to him entitles him to sue in his own name for the price of the goods: *Williams v Millington (1788) 1 H.Bl. 81; Benton v Campbell, Parker & Co Ltd [1925] 2 K.B. 410, 416.*

294. *Robinson v Rutter (1855) 4 E. & B. 954.* See Harvey and Meisel, *Auctions Law and Practice*, 3rd edn (2006), paras 4.50–4.61.

295. *Manley & Sons Ltd v Berkett [1912] 2 K.B. 329.*

296.  *Grice v Kenrick (1870) L.R. 5 Q.B. 340; Manley Sons Ltd v Berkett [1912] 2 K.B. 329.*

297.  *Wallace v Kelsall (1840) 7 M. & W. 264; Husband v Davis (1851) 10 C.B. 645; Powell v Brodhurst [1901] 2 Ch. 160; Barrett v Universal Island Records Ltd [2006] EWHC 1009 (Ch), [2006] E.M.L.R. 21 at [214].*

298.  *Porter & Bristow v Taylor (1817) 6 M. & S. 156.* But payment to the firm of a separate debt due to one partner is not payment of the debt unless the firm was authorised to receive it: *Powell v Brodhurst [1901] 2 Ch. 160.* See further Lindley and Banks on Partnership, 19th edn (2010), paras 12-53—12-54.

299.  *Husband v Davis (1851) 10 C.B. 645.*

300.  *Stone v Marsh (1826) Ry. & M. 364, 369.*

301.  *Innes v Stephenson (1831) 1 Moo. & Rob. 145.* cf. the similar rule in the case of Bank of England stock: *Welch v The Bank of England [1955] Ch. 508.*

302.  *Can v Read (1749) 3 Atk. 695; Jacomb v Harwood (1751) 2 Ves. Sen. 265, 267; Charlton v Durham (1869) L.R. 4 Ch. App. 433.*

303.  "Personal representative" and "representation" mean probate or administration and executor or administrator: Administration of Estates Act 1925 s.55(1)(xi) and (xx).

304.  s.55(1)(xi) and (xx).

305.  cf. cases before statutory provision: *Allen v Dundas (1789) 3 T.R. 125; Prosser v Wagner (1856) 1 C.B.(N.S.) 289.*

306.  Above, paras 20-018 et seq.

307.  para.10 of Pt II of Sch.5 to the Insolvency Act 1986 (by virtue of s.314). Section 306 provides for the bankrupt's estate to vest in the trustee.

308.  Previously known as a garnishee order. See further Blackstone's Civil Practice 2015 (2015), paras 79.19–79.24 and N. Andrews, *English Civil Procedure* (2003), paras 39.26–39.38.

309.  CPR 72.2(2) and see further CPR 72.4–72.6 and PD 72 paras 1–3.

310.  CPR 72.9(1).

311.  CPR 72.9(2).

312.  CPR 72.9(3).

313.  Below, paras 22-032 et seq.

314.  Below, paras 22-012 et seq.

315.  Above, paras 4-086—4-103; cf. below, paras 22-040 et seq.

316.  Below, paras 22-016—22-018.

317.  Above, paras 4-117 et seq.

318.  Below, para.22-012; above, paras 4-047 et seq.

319.  See above, paras 13-041 et seq., 21-011 et seq.; below, para.21-091. In *Mardorf Peach & Co Ltd v Attica Sea Carriers Corp of Liberia [1977] A.C. 850* it was assumed that payment due to be made into a banking account on a date which turned out to be a non-banking day must be

made not later than the previous banking day. See also above, para.21-023 n.152.

320.  *Hughes v Lenny (1839) 5 M. & W. 183*. In the case of a divisible obligation (above, para.21-038) where no time for payment has been fixed, the person performing the work may be entitled to claim payment for parts of the work already completed: *Roberts v Havelock (1832) 3 B. & Ad. 404*; *The Tergeste [1903] P. 26*.

321.  *Toms v Wilson (1862) 4 B. & S. 442, 453* ("[H]e must have a reasonable time to get it from some convenient place. For instance, he might require time to get it from his desk, or to go across the street or to his bankers for it") (approved in *Moore v Shelley (1883) 8 App. Cas. 285, 293*). The reasonableness of the opportunity given to a debtor (who is required to pay on demand) may depend on the debtor's knowledge (or means of knowledge) of the amount due, and on the information supplied by the creditor: *Bunbury Foods Pty Ltd v National Bank of Australia Ltd (1984) 153 C.L.R. 491*.

322.  *R.A. Cripps & Son Ltd v Wickenden [1973] 1 W.L.R. 944, 955*. See also *Brighty v Norton (1862) 3 B. & S. 305, 312*; *Toms v Wilson (1862) 4 B. & S. 442*.

323.  Above, paras 21-011 et seq.

324.  Above, paras 21-011—21-018.

325.  Contrast stipulations as to the time of delivery, above, para.21-013 n.80.

326.  Except where there is waiver or variation of the obligation to pay at the specified place: see below, paras 22-032—22-046; *Gyles v Hall (1726) 2 P. Wms. 378* (debtor gave creditor notice of his intention to pay at a specified time and place; creditor made no objection, and therefore waived personal tender anywhere else).

327.  *Robey & Co v Snaefell Mining Co Ltd (1887) 20 Q.B.D. 152*; *The Eider [1893] P. 119, 128*; *Thompson v Palmer [1893] 2 Q.B. 80*; *Charles Duval & Co Ltd v Gans [1904] 2 K.B. 685*; *Fowler v Midland Electric Corp for Power Distribution Ltd [1917] 1 Ch. 656*. The general rule applies to a tenant: *Haldane v Johnson (1853) 8 Exch. 689*; also where the creditor was out of England when the contract was made, but not where the creditor left England after the date: *Fessard v Mugnier (1865) 18 C.B.(N.S.) 286*. The presumption that the debtor must seek out the creditor at his place of business and pay him there is of long standing but it is readily displaced implicitly and not just expressly; in considering whether the presumption has been displaced the court can take account of modern ways of making commercial payment based on its daily experience: *Canyon Offshore Ltd v GDF Suez E&P Nederland BV [2014] EWHC 3810 (Comm), [2015] Bus. L.R. 578* at [38].

328.  *Riley v William Holland & Sons Ltd [1911] 1 K.B. 1029, 1031*.

329.  *Rein v Stein [1892] 1 Q.B. 753, 758*; *Charles Duval & Co Ltd v Gans [1904] 2 K.B. 685*; *Drexel v Drexel [1916] 1 Ch. 251, 259, 260*.

330.  *Thorn v City Rice Mills (1889) 40 Ch. D. 357*; cf. *Re Escalera Silver Lead Mining Co (1908) 25 T.L.R. 87*; *Re Harris Calculating Machine Co [1914] 1 Ch. 920*.

331.  See below, para.21-089. On payment by bankers' commercial credit, see Vol.II, paras 34-445 et seq., para.44-238. On payment into the creditor's bank account, see above, para.21-046.

332.  Below, paras 21-075—21-083.

333.  *Luttges v Sherwood (1895) 11 T.L.R. 233*; *Pennington v Crossley & Son (1897) 77 L.T. 43*; *Baker v Lipton Ltd (1899) 15 T.L.R. 435*; *Warnborough Ltd v Garmite Ltd [2006] EWHC 10 (Ch)* at [84], [93]. The fact that payment is usually made through the post is insufficient of itself to show that the creditor has assumed the risk of loss in the post: *Avocet Industrial Estates LLP v Merol Ltd [2011] EWHC 3422 (Ch), [2012] 1 E.G.L.R. 65* at [55].

334. *Norman v Ricketts (1886) 3 T.L.R. 182* (the cheque reached the hands of a third person who received payment); *Thairlwall v Great Northern Ry [1910] 2 K.B. 509* (dividend warrant lost in the post; the stockholder would probably have been able to obtain another warrant under s.69 of the Bills of Exchange Act 1882 (see Vol.II, para.34-145) or to have brought an action on the warrant); but cf. *Tankexpress A/S v Compagnie Financière Belges des Petroles SA [1949] A.C. 76* (letter delayed in the post); *Zim Israel Navigation Co Ltd v Effy Shipping Corp [1972] 1 Lloyd's Rep. 18* (affirmed *[1972] 2 Lloyd's Rep. 91*). cf. posting a letter giving notice of dishonour of a bill: *Walter v Haynes (1824) Ry & M. 149*; *Berridge v Fitzgerald (1869) L.R. 4 Q.B. 639*.

335. *Pennington v Crossley & Son (1897) 77 L.T. 43.*

336. *Mitchell-Henry v Norwich Union Life Insurance Society [1918] 2 K.B. 67.*

337. *Robb v Gow (1905) 8 F. 90.*

338. See above, para.21-046.

339. *Edmundson v Longton Corp (1902) 19 T.L.R. 15.*

340. *Avocet Industrial Estates LLP v Merol Ltd [2011] EWHC 3422 (Ch), [2012] 1 E.G.L.R. 65*; *Beevers v Mason (1978) 37 P. & C.R. 452.*

341. *Homes v Smith [2000] Lloyd's Rep. Bank. 139* at [23].

342. See below, para.21-084.

343. *Re Charge Card Services Ltd [1989] Ch. 497.*

344. *Eyles v Ellis (1827) 4 Bing. 112*; *Mountford v Harper (1847) 16 L.J. Ex. 184* (proceeds of cheque drawn by debtor received by creditor); *Gadderer v Dawes (1847) 10 L.T.(O.S.) 109*; *Douglas v Lloyds Bank Ltd (1929) 34 Com. Cas. 263* (payment presumed from lapse of time where no explanation given for the delay: cf. *Cooper v Turner (1819) 2 Stark. 497*).

345. The practice of giving receipts for ordinary debts paid by cheque has been largely discontinued since the enactment of s.3 of the Cheques Act 1957 which provides: "An unindorsed cheque which appears to have been paid by the banker on whom it is drawn is evidence of the receipt by the payee of the sum payable by the cheque".

346. *Straton v Rastall (1788) 2 T.R. 366*; *Hawkins v Gardiner (1854) 2 Sm. & G. 441*; *Wilson v Keating (1859) 27 Beav. 121.*

347. e.g. in full satisfaction of all claims: *Lee v Lancashire & Yorkshire Ry (1871) L.R. 6 Ch. App. 527*; *Ellen v G. N. Ry (1901) 17 T.L.R. 453*; cf. *Oliver v Nautilus Steam Shipping Co Ltd [1903] 2 K.B. 639.*

348. e.g. *Graves v Key (1832) 3 B. & Ad. 313.*

349. *Re W.W. Duncan & Co [1905] 1 Ch. 307*; cf. *Nathan v Ogdens Ltd (1905) 94 L.T. 126.*

350. *Skaife v Jackson (1824) 3 B. & C. 421*; *Farrar v Hutchinson (1839) 9 A. & E. 641*; *Cesarini v Ronzani (1858) 1 F. & F. 339*; *Ward & Co v Wallis [1900] 1 Q.B. 675.*

351. *Bowes v Foster (1858) 2 H. & N. 779.*

352. *Rimmer v Webster [1902] 2 Ch. 163*; *Powell v Browne [1907] W.N. 228*; *Tsang Chuen v Li Po Kwai [1932] A.C. 715.*

353. Sometimes the form is statutory as in the Bills of Sale Act (1878) Amendment Act 1882 s.9. See *Burchell v Thompson [1920] 2 K.B. 80.*

354. Law of Property Act 1925 s.67.

355. As from February 1, 1971, the former stamp duty of 2d on a receipt for £2 or more was abolished by the Finance Act 1970 s.32 and Sch.7 para.2.

© 2018 Sweet & Maxwell



The Weekly Law Reports 22 May 1998

896

[1998]

[HOUSE OF LORDS]                                                                      A

*INVESTORS COMPENSATION SCHEME LTD. . . .    APPELLANTS

AND

WEST BROMWICH BUILDING SOCIETY   .    .    .   RESPONDENTS

AND                                                                           B

SAME    .    .    .    .    .    .    .    .    .    APPELLANTS

AND

HOPKIN & SONS (A FIRM) AND OTHERS   .    .    .   RESPONDENTS

1997   April 21, 22, 23;          Lord Goff of Chieveley, Lord Lloyd of Berwick,
       June 19                               Lord Hoffmann, Lord Hope of Craighead   C
                                                             and Lord Clyde

*Financial Services—Compensation—Statutory scheme—Investors' rights
assigned to scheme—Whether right of rescission chose in action—
Whether misuse of language or syntax to be taken into account in
construing assignment—Whether assignment valid*

On the advice of independent financial advisers, investors    D
entered into home income plans under which they took out
mortgages on their homes with certain building societies to secure
advances which were then invested in equity-linked bonds. They
suffered heavy losses as a result of a fall in equities and rise in
interest rates. The financial advisers having become insolvent, the
investors lodged claims for compensation with the Investors
Compensation Scheme Ltd., the body established pursuant to    E
section 54 of the Financial Services Act 1986[1] to provide a
compensation fund for persons with unsatisfied claims against
persons authorised to carry on investment business. The scheme's
claim form required the investor to assign to the scheme all rights
arising out of the transaction against the financial advisers and
anyone else, subject to a reservation of certain rights against the
building society which provided the mortgage. Section 3(b) of the    F
form excepted from the assignment the benefits of any claim
(whether sounding in rescission for undue influence or otherwise)
that the investor might have against the building society in which
he claimed an abatement of sums he would otherwise have to pay
the building society in respect of the mortgage loan or interest on
that loan. The scheme declined to compensate investors for
moneys which they had given away or spent on themselves, or    G
professional fees or damages for illness, anxiety and stress and the
decision not to do so was upheld by the House of Lords. The
scheme then brought proceedings against various building societies
and firms of solicitors for compensation for breach of statutory
duty under the Act of 1986 and damages for breach of duty at
common law, claiming to sue as assignee of the investors. The
question arose whether section 3(b) meant there had not been a
valid assignment of investors' rights against the building society.
The judge decided as a preliminary issue that section 3(b) had    H
only reserved to the investor the right to an adjustment of the
mortgage debt in the event of rescission as part of a mutual
restoration of benefits but that the purported assignment, being
an assignment of part of the remedy attaching to a chose in
action, was void. The Court of Appeal held that the words of
section 3(b) could not bear the judge's construction.

[1] Financial Services Act 1986, s. 54: see post, pp. 907G–908H.

The Weekly Law Reports 22 May 1998

897

1 W.L.R.                    I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))

A
On appeal by the scheme to the House of Lords:—

*Held*, allowing the appeal (Lord Lloyd of Berwick dissenting), that in construing contractual documents the aim was to find the meaning which the document would convey to a reasonable person having all the background knowledge reasonably available to the parties, including anything which would have affected the way a reasonable man would have understood it, but excluding previous negotiations and declarations of subjective intent; that the meaning

B
which a document would convey to a reasonable man was what the parties using its words against the relevant background would reasonably have been supposed to mean and included the possibility of ambiguity and even misuse of words or syntax; that the court was not obliged to ascribe to the parties an intention which plainly they could not have had, and in choosing between competing unnatural meanings was entitled to decide that the

C
parties must have made mistakes of meaning or syntax; that a claim to rescission could be made only by the owner of the mortgaged property and was not a separately assignable chose in action but was simply part of the process of rescission; and that in reserving to the investor any claim to abatement of the mortgage debt consequent on rescission section 3(b) was not cutting down the scope of the chose in action assigned to the scheme but was merely intended to make clear that the investor would not be accountable to the scheme for any abatement of the

D
debt as a result of an action for rescission of the mortgage; that the claim form was effective to assign to the scheme the whole of the investors' claim to compensation and damages, although they retained the right to claim rescission of their mortgages on such terms as the court might consider just; and that, accordingly, the scheme could maintain the actions against the building societies and the solicitors (post, pp. 898H, 912H–913E, 914E–F, 916D–917A,

E
918A–G).

Decision of the Court of Appeal reversed.

The following cases are referred to in their Lordship's opinions:

*Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191; [1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)

*Barclays Bank Plc. v. O'Brien* [1994] 1 A.C. 180; [1993] 3 W.L.R. 786; [1993]

F
4 All E.R. 417, H.L.(E.)

*Charter Reinsurance Co. Ltd. v. Fagan* [1997] A.C. 313; [1996] 2 W.L.R. 726; [1996] 3 All E.R. 46, H.L.(E.)

*Investors Compensation Scheme Ltd. v. Cheltenham and Gloucester Building Society* (unreported), 1 November 1995, Evans-Lombe J.

*Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C. 749; [1997] 2 W.L.R. 945; [1997] 3 All E.R. 352, H.L.(E.)

*Porter v. National Union of Journalists* [1980] I.R.L.R. 404, H.L.(E.)

G
*Prenn v. Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237, H.L.(E.)

*Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989; [1976] 3 All E.R. 570, H.L.(E.)

*Reg. v. Investors Compensation Scheme Ltd., Ex parte Bowden* [1996] A.C. 261; [1995] 3 W.L.R. 289; [1995] 3 All E.R. 605, H.L.(E.)

*Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.* [1974] A.C. 235; [1973] 2 W.L.R. 683; [1973] 2 All E.R. 39, H.L.(E.)

H
*Wilson v. United Counties Bank Ltd.* [1920] A.C. 102, H.L.(E.)

The following additional cases were cited in argument:

*Archer v. Brown* [1985] Q.B. 401; [1984] 3 W.L.R. 350; [1984] 2 All E.R. 267

*Barings Plc. v. Coopers & Lybrand*, The Times, 6 December 1996; Court of Appeal (Civil Division) Transcript No. 1557 of 1996, C.A.

*Bechervaise v. Lewis* (1872) L.R. 7 C.P. 372

*Bristol and West Building Society v. May May & Merrimans* [1998] 1 W.L.R. 336; [1997] 3 All E.R. 206

The Weekly Law Reports 22 May 1998

898

I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))                    [1998]

*Cheese v. Thomas* [1994] 1 W.L.R. 129; [1994] 1 All E.R. 35, C.A.                       A
*Christensen v. Scott* [1996] 1 N.Z.L.R. 273
*Derry v. Peek* (1889) 14 App.Cas. 337, H.L.(E.)
*Durham Brothers v. Robertson* [1898] 1 Q.B. 765, C.A.
*Erlanger v. New Sombrero Phosphate Co.* (1878) 3 App.Cas. 1218, H.L.(E.)
*F. & B. Entertainments Ltd. v. Leisure Enterprises Ltd.* (1976) 240 E.G. 455
*Federal Commerce & Navigation Co. Ltd. v. Molena Alpha Inc.* [1978] Q.B. 927;
    [1978] 3 W.L.R. 309; [1978] 3 All E.R. 1066, Kerr J. and C.A.                       B
*Forster v. Baker* [1910] 2 K.B. 636, Bray J. and C.A.
*Hanak v. Green* [1958] 2 Q.B. 9; [1958] 2 W.L.R. 755; [1958] 2 All E.R. 141,
    C.A.
*Kleiss v. Captain Snooze Pty. Ltd.* (unreported), 18 January 1996, Federal
    Court of Australia
*Morris (B.O.) Ltd. v. Perrott and Bolton* [1945] 1 All E.R. 576, C.A.
*Newbigging v. Adam* (1886) 34 Ch.D. 582, C.A.
*O'Sullivan v. Management Agency and Music Ltd.* [1985] Q.B. 428; [1984]           C
    3 W.L.R. 448; [1985] 3 All E.R. 351, C.A.
*Redgrave v. Hurd* (1881) 20 Ch.D. 1, C.A.
*Steel Wing Co. Ltd., In re* [1921] 1 Ch. 349
*T.S.B. Bank Plc. v. Camfield* [1995] 1 W.L.R. 430; [1995] 1 All E.R. 951, C.A.
*Unsworth Trusts, In re* (1865) 2 Dr. & Sm. 337
*Whittington v. Seale-Hayne* (1900) 82 L.T. 49                                             D
*Wilson v. United Counties Bank Ltd.* [1920] A.C. 102, H.L.(E.)

APPEAL from the Court of Appeal.
    This was an appeal by the Investors Compensation Scheme Ltd.
("I.C.S.") with leave of the House of Lords (Lord Mustill, Lord Steyn and
Lord Hope of Craighead) given on 27 February 1997 from the decision of
the Court of Appeal (Leggatt, Swinton Thomas and Mummery L.JJ.)        E
delivered on 1 November 1996 dismissing the appeal of I.C.S. from a
decision of Evans-Lombe J. delivered on 3 October 1996 on a trial of
preliminary issues in actions against the defendant, the West Bromwich
Building Society ("W.B.B.S."), by Eric John Alford, Gladys Armitage and
others ("the investors") and the I.C.S., and against Hopkin & Sons and
other firms of solicitors, by the I.C.S., that the investors' claims had not
been validly assigned to I.C.S. Philip Haring, one of the investors,            F
intervened on their behalf.
    The facts are stated in the opinion of Lord Hoffmann.

    *Geoffrey Vos Q.C.,* Denis Brock, solicitor, and *Guy Morpuss* for the
I.C.S.
    *David Oliver Q.C., Andrew Hochhauser Q.C.* and *Vernon Flynn* for the     G
W.B.B.S.
    *Jonathan Sumption Q.C.* and *Mark Cannon* for Hopkin & Sons.
    *Nicholas Strauss Q.C.* and *Neil Kitchener* for Mr. Haring.

    Their Lordships took time for consideration.

    19 June. LORD GOFF OF CHIEVELEY. My Lords, I have had the          H
opportunity of reading in draft the speech of my noble and learned friend,
Lord Hoffmann. I agree with the conclusion which he has reached as to
the construction to be placed upon section 3(b) of the Investors
Compensation Scheme claim form and, for the reasons given by him,
I would answer the questions directed by Evans-Lombe J. to be tried as
preliminary issues in the manner proposed by my noble and learned friend.
I would therefore allow the appeal.

1 W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))

A   LORD LLOYD OF BERWICK.   My Lords.

*Background*

This is the second occasion on which the House has had to consider the scheme for compensating investors set up under section 54 of the Financial Services Act 1986. On the first occasion I described the Rules made by the Securities and Investment Board under section 54(6) of the
B   Act as being needlessly confusing and obscure. On this occasion it is not the Rules that are primarily in issue, but a single clause in the claim form which investors are required to sign when making a claim for compensation; and the problem arises not from any obscurity of the language (the meaning is, I think, tolerably clear) but from slovenly drafting.

The general background to the home income plans, and the reasons
C   why so many investors have come to grief, have already been described in the judgments in the earlier appeal, and need not be repeated here. The particular background to the present appeals are proceedings brought by two groups of investors against West Bromwich Building Society ("W.B.B.S.") for damages for negligence at common law and under section 2(1) of the Misrepresentation Act 1967. They also claim rescission of their mortgages on the ground of misrepresentation and undue influence,
D   equitable compensation, damages in lieu of rescission under section 2(2) of the Act of 1967, and a variety of other remedies. Some of these remedies overlap.

The Investors Compensation Scheme Ltd. ("I.C.S.") have also commenced proceedings against W.B.B.S. in which they claim as assignees of the Investors' rights against W.B.B.S. They assert that all the investors'
E   claims against W.B.B.S. have been validly assigned to I.C.S., with the exception of the investors' claim for rescission. It follows that there are competing claims against W.B.B.S. for the same damages, by the investors on the one hand and I.C.S. on the other. The resolution of the issue which thus arises indirectly between I.C.S. and the investors depends on the true construction of the claim form, and in particular on the scope of the provisions relating to the assignment of the investors' rights against third
F   parties.

As between I.C.S. and W.B.B.S. there is a further issue. For W.B.B.S. allege in the alternative that if the question of construction is resolved in favour of I.C.S., and the investors have purported to assign their claims for damages against W.B.B.S., then the assignment is void or unenforceable on grounds of public policy.

G   In addition to their claim against W.B.B.S., I.C.S. have brought proceedings against numerous firms of solicitors, in which they claim damages for negligence in advising their clients in relation to the home income plans. These proceedings are also brought as assignees under the claim form. But there are two important differences. In the first place, there is no issue as to the meaning or scope of the assignment in the case of claims against the solicitors. Secondly (and no doubt for the same
H   reason) none of the investors have brought their own proceedings against the solicitors. So there is no underlying conflict between I.C.S. and the investors in relation to the I.C.S. claim against the solicitors. The solicitors' defence is the same as the alternative argument advanced by W.B.B.S., namely, that the assignment is void or unenforceable on grounds of public policy.

Before turning to the question of construction, it is convenient to set out the main provisions of the claim form. The form is addressed to the

900

Lord Lloyd of Berwick   I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))                    [1998]

individual investor. In section 2 it sets out the amount of the compensation     A
to which the recipient is entitled under the scheme. Section 3(a) sets out
the claimants' declaration. It provides (in a typical case) as follows:

> "I/we hereby claim compensation for losses amounting to £20,345 as
> a result of the default of Fisher Prew-Smith … I/we believe … that
> I/we have a claim against the firm in respect of negligent acts and/or
> advice given by Fisher Prew-Smith on or after 28 August 1988 …     B
> I/we confirm that I/we have received no compensation of any kind in
> respect of amounts owed to me/us at the date of default by Fisher
> Prew-Smith or any other person. I/we also confirm that I/we do not
> expect to receive any such compensation in the future … I/we
> understand that subject to section 3(b) below: 1. I/we are not obliged
> to make a claim under this scheme. 2. Investors' Compensation
> Scheme Ltd. … will take over my/our rights and claims against Fisher     C
> Prew-Smith and other third parties on the payment of any
> compensation as described in the transfer of rights at section 4 of this
> form."

The claimants' declaration is then signed by the investor.
     Section 3(b), on which the present appeal turns, sets out a counter-     D
declaration by I.C.S. It provides:

> "I.C.S. agrees that the following claims shall not be treated as a 'third
> party claim' (as defined in section 4 of this form) for the purposes of
> this agreement and that the benefits of such claims shall enure to you
> absolutely: Any claim (whether sounding in rescission for undue
> influence or otherwise) that you have or may have against the West
> Bromwich Building Society in which you claim an abatement of sums     E
> which you would otherwise have to repay to that society in respect of
> sums borrowed by you from that society in connection with the
> transaction and dealings giving rise to the claim (including interest on
> any such sums)."

     Section 4 is headed "Investor's agreement and acknowledgement (rights
against participant firm)." It provides as follows:     F

> "1. I/we agree that my/our rights against the participant firm in
> respect of the claim shall pass to Investors Compensation Scheme
> Ltd. ('I.C.S.') on payment of compensation pursuant to the Financial
> Services (Compensation of Investors) Rules 1990 ('the rules') …
> 3. I/we acknowledge that under the rules on payment of the amount
> of £20,345·15 I/we will no longer have the right to make a claim     G
> against the participant firm in respect of the claim and that any such
> right will be vested in I.C.S. pursuant to the rules, and I/we further
> acknowledge that any sums which would otherwise be payable to me/
> us in respect of the claim by the participant firm, or by any trustee
> appointed under the Financial Services Act 1986, shall be paid instead
> to I.C.S. … 5. I/we agree that in the event of my/our receiving any
> moneys or assets in respect of the claim from the participant firm or     H
> from any trustee appointed under the Financial Services Act 1986
> I/we will forthwith pay or transfer them to I.C.S. 6. I/we hereby
> assign absolutely to I.C.S. each and every third party claim and the
> benefit thereof . . . 12. In this document, 'third party claim' means
> any right, claim or cause of action which the claimant has or may
> have against any person other than the participant firm or against any
> fund or property in the hands of any person other than the participant

A        firm and arising out of the circumstances giving rise to the claim or
         otherwise relating to the claim whether such claims shall arise in debt,
         breach of contract, tort, breach of trust or in any other manner
         whatsoever (and including all sums to which I/we may become entitled
         under sections 6 and 61 of the Financial Services Act 1986)."

B        Section 4 is then signed by the investor. There follows an explanatory note.
         Paragraphs 1, 2 and 3 are all concerned with the assignment of claims
         against the participant firm, in this case Fisher Prew-Smith. Paragraph 4
         is concerned with the assignment of third party claims. It provides:

                "4. You also agree that I.C.S. should be able to use any rights
         which you now have against anyone else in relation to the claim.
         Examples might be directors of the firm or other persons also
C        responsible for causing the loss for which you are being com-
         pensated. You give up all those rights and transfer them to I.C.S.
         (paragraph 6)."

         So much for the general shape of the claim form. I now return to
         section 3(b). It provides for an exception in respect of third party claims
         assigned under paragraph 6 of section 4. Mr. Vos on behalf of I.C.S.
D        submits that the exception is confined to claims against W.B.B.S. for
         rescission. Mr. Oliver on behalf of W.B.B.S. and Mr. Strauss on behalf of
         the investors submit that the exception covers all claims against W.B.B.S.
         whether for rescission or not, in which the investor claims a reduction in
         the amount due under the mortgage loan.

         This is not the first time the court has had to consider the meaning of
         section 3(b). The same question arose in proceedings brought by I.C.S.
E        against Cheltenham and Gloucester Plc., formerly known as Cheltenham
         and Gloucester Building Society. In that case Evans-Lombe J., who has
         had overall charge of the litigation, ordered, and subsequently tried, a
         preliminary issue as to the construction of section 3(b). He held that the
         more natural meaning of the words was that for which the investors
         contend; in other words that the exception covers all possible claims
F        against Cheltenham and Gloucester, and is not limited to claims for
         rescission. However, he went on to reject what he regarded as the more
         natural meaning of the words on the ground that it produced a "ridiculous"
         result, contrary to the "demonstrable purpose of the parties in entering
         into the claim forms." He thus upheld I.C.S.'s construction even though it
         meant, in his view, doing violence to the language of the claim form.

         When the present proceedings were before Evans-Lombe J., he repeated
G        his view that the investors' construction was the more natural meaning of
         the words, but held once again that such meaning was displaced by a
         consideration of the surrounding circumstances, and in particular by the
         need for an "efficient system" to enable I.C.S. to recover its outlay.
         However, the learned judge went on to hold that the purported assignment
         in favour of I.C.S. was invalid, on the grounds that the assignment of
H        some but not all the remedies available against W.B.B.S. in respect of a
         single cause of action is ineffective in law. Since the assignment was invalid,
         it followed that the investors were free to pursue their claims for damages
         against W.B.B.S.

         I.C.S. appealed to the Court of Appeal. The Court of Appeal agreed
         with Evans-Lombe J. that the investors' construction accords with the
         natural meaning of the words. But unlike the judge they did not regard
         the result as commercially ridiculous. Leggatt L.J. who gave the leading

902

Lord Lloyd of Berwick   I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          [1998]

judgment said: "There is simply no warrant for limiting the rights retained   A
to claims for or consequent upon rescission." I find myself in complete
agreement with the Court of Appeal.

*The question of construction*

A useful starting point for ascertaining the meaning of section 3(b) of
the claim form is to put oneself in the position of the ordinary investor to   B
whom the claim form is addressed. This was the approach adopted by the
House in *Porter v. National Union of Journalists* [1980] I.R.L.R. 404. They
question in that case concerned the proper construction of the rules of the
N.U.J. Lord Diplock said, at p. 407:

"I turn then to the interpretation of the relevant rules, bearing in
mind that their purpose is to inform the members of the N.U.J. of
what rights they acquire and obligations they assume vis-à-vis the   C
union and their fellow members, by becoming and remaining members
of it. The readership to which the rules are addressed consists of
ordinary working journalists, not judges or lawyers versed in the
semantic technicalities of statutory draftsmanship."

The purpose of the claim form was to inform the investor in relatively   D
non-technical language what his rights and liabilities were to be on receipt
of compensation under the scheme. No doubt the investor would start by
reading the explanatory note, as he is invited to do before signing
section 4. He would notice that the first three paragraphs of the
explanatory note are all dealing with his right to claim against the
defaulting firm, Fisher Prew-Smith. This would not surprise him. For it
was the firm of Fisher Prew-Smith which led him into his disastrous   E
investment. He would well understand that I.C.S. might wish to recover
some or all of its outlay from that firm: see paragraph 2 of the explanatory
note. He might then turn to section 4 itself. He would at once notice that
the heading of section 4 refers specifically to "rights against participant
firm." Next he would find that the first five paragraphs of section 4 are all
dealing with the claim against Fisher Prew-Smith. He would infer that the
claim against Fisher Prew-Smith was of primary importance to I.C.S.;   F
otherwise it would hardly have been given such prominence.

Next he would read paragraph 4 of the explanatory note. He would
note that he was to give up his rights against "anyone else" in relation to
the claim (i.e. the claim against Fisher Prew-Smith). The examples given
are any rights he might have against a director of Fisher Prew-Smith "or
any persons also responsible" for causing his loss. He might or might not   G
at that stage envisage a claim against W.B.B.S.; probably not. Certainly the
reference to "other persons" in the context of the directors of Fisher Prew-
Smith does not serve to highlight a possible claim against W.B.B.S. If he
were in doubt, he would turn to paragraph 6 of section 4, note the
definition of third party claim in paragraph 12, and so· come to
section 3(b).

On a quick reading of section 3(b) our hypothetical reasonable investor   H
would notice that it excludes from the definition of third party claim any
claim which he might have against W.B.B.S. for an "abatement" of sums
due under his mortgage. The benefit of any such claim was to enure to
him absolutely. In other words it was *not* to pass to I.C.S. under any
circumstances. He would probably not pause over the words in brackets,
recognising that words in brackets do not ordinarily govern the meaning
of the rest of the sentence, especially if the parenthesis starts with the word

A   "whether" and ends with the words "or otherwise." He might well, in passing, understand the words in brackets as being the equivalent of "whether or not sounding in rescission for undue influence." He would then come to "abatement." This would strike him as an unusual word in the context. So he would turn to his lawyer (who is assumed to be at his elbow) and ask him whether abatement has some special meaning in law.

B   His lawyer would reply that abatement has a technical meaning in the law of nuisance, and in connection with contracts for the sale of goods and the provision of services. But otherwise it simply means reduction. It has no technical meaning in relation to rescission. Counsel were unable to point to a single case in which the word had been used in that connection. So the investor would understand that if he still owed money on his mortgage, as would almost always be the case, he would retain the right to

C   sue W.B.B.S. in order to reduce his outstanding debt. Again, this would not surprise him. For in most cases he would not have recovered full compensation from I.C.S., and in some cases nothing like full compensation. Certainly he would wish to have all defences available should W.B.B.S. start proceedings against him for recovery of the loan.

So the position would be that he, the investor, would retain his right to sue W.B.B.S. for a reduction of the mortgage debt, but I.C.S. would obtain

D   the right to sue Fisher Prew-Smith and "third parties" other than W.B.B.S., on the understanding that I.C.S. would reassign those rights on request, should they not be needed: see paragraph 5 of the explanatory note. This would strike the investor as fair and reasonable. At this stage our hypothetical investor would feel that he understood his rights and obligations well enough and would sign section 4.

E   Is there, then, any reason why the courts should not give section 3(b), and the claim form as a whole, the same meaning as the investor? (I shall refer to this as "the plain meaning." ) The objections fall into two groups. The first group of objections relate to the language of section 3(b); the second group of objections relate to the legal and commercial consequences of adopting the plain meaning. I suspect that none of these objections would occur to anyone other than a lawyer.

F   *The meaning of the language*

The objection to the plain meaning is the inclusion of the words "for undue influence" after "rescission;" for any lawyer would know that there are other grounds on which the investor might claim rescission, for example, on the ground of misrepresentation. Why, therefore, should the draftsman have specifically included one of the grounds on which the

G   investor might claim rescission, but not others?

We do not know the answer to this question. It may be that if one had access to the preliminary drafts of the claim form, or to the mind of the draftsman himself, the answer would emerge clearly enough. It may be that a claim for rescission on the ground of undue influence was, for some reason, uppermost in the draftsman's mind; so he put the words in. But

H   we cannot go into the draftsman's mind. We having nothing to go on but the words he has used. The inclusion of undue influence is odd, but not so odd as to obscure the meaning. "Or otherwise" must relate back to "whether sounding in rescission." Any other construction would leave "whether" hanging in the air. So "or otherwise" covers claims in contract and tort. It is not limited to other grounds for claiming rescission. The drafting is slovenly. But I do not have any great difficulty with the meaning.

904

Lord Lloyd of Berwick   I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))            [1998]

It is said that the plain meaning would make the words in brackets    A
otiose. So indeed it would. But words in brackets are often otiose,
especially brackets in the format "(whether … or otherwise)." They show
that the general words which precede the parenthesis are not limited to
any particular kind of claim, but cover all claims so long as they are
claims for reduction of sums due.

What are the alternatives? Mr. Vos submits that section 3(b) means    B
"any claims sounding in rescission (whether for undue influence or
otherwise) in which you claim an abatement …" I agree with Evans-
Lombe J. that such a construction does violence to the language. I know
of no principle of construction (whether by reference to what Lord
Wilberforce said in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1384–1386 or
otherwise) which would enable the court to take words from within the
brackets, where they are clearly intended to underline the width of "any    C
claim," and place them outside the brackets where they have the exact
opposite effect. As Leggatt L.J. said in the Court of Appeal, such a
construction is simply not an available meaning of the words used; and it
is, after all, from the words used that one must ascertain what the parties
meant. Purposive interpretation of a contract is a useful tool where the
purpose can be identified with reasonable certainty. But creative    D
interpretation is another thing altogether. The one must not be allowed to
shade into the other.

So with great respect to those taking a different view, I do not regard
the present case as raising any question of ambiguity, or of choosing
between two possible interpretations. The construction advocated by the
investors, though it gives rise to the oddity which I have mentioned, is a
permissible construction of the words used. The I.C.S.'s construction is    E
not.

Nor does the I.C.S. construction avoid one of the main objections
which is raised against the investors' construction. If "whether sounding in
rescission for undue influence or otherwise" is otiose on the investors'
construction, so also is "whether for undue influence or otherwise" on the
I.C.S.'s construction. Indeed the objection is all the greater, since a claim
for rescission would necessarily result in an abatement, if by abatement is    F
meant the financial adjustment which takes place in any event on rescission
of a contract, and which would in this case be limited (if Mr. Vos's
argument is correct) to repayment of W.B.B.S.'s charges and an adjustment
in the rate of interest on the loan. On that view, section 3(b) would be an
elaborate way of saying very little indeed.

                                                                        G

*The legal and commercial consequences*

If Evans-Lombe J. is right that the investors' construction is the more
natural meaning of section 3(b) and if, a fortiori, the Court of Appeal is
right that the I.C.S.'s construction is not even a possible meaning of the
language used, then it would take a very strong case indeed before
I would reject the former meaning in favour of the latter. As Lord Mustill
said in *Charter Reinsurance Co. Ltd. v. Fagan* [1997] A.C. 313, 387:    H

"If … the words 'actually paid' can only as a matter of language and
context mean what the syndicates maintain, I would hesitate long
before giving them any other meaning, just because the result would
be extraordinary."

What then are the consequences of the investors' construction which
are said to be so extraordinary, or so "very unreasonable" (the expression

A    used by Lord Reid in *Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.*
[1974] A.C. 235, 251), and which Evans-Lombe J. described as producing
a ridiculous result? I start with the commercial consequences. It is said
that I.C.S. would have wanted to take over the investors' claim against
W.B.B.S., as well as their claim against Fisher Prew-Smith, since W.B.B.S.
would be worth suing, whereas Fisher Prew-Smith, being insolvent, would
not. Secondly it is said that the investors would have little incentive to sue

B    W.B.B.S., once they had received compensation from I.C.S. A third
objection was that the investors would not be entitled to claim on their
own behalf, once they had accepted compensation. This third objection is
now accepted as being wrong in law, and is no longer relied on.

By way of answer to the second objection, Mr. Strauss pointed out
that since, in the generality of cases, investors had received only between

C    half and three-quarters of their losses by way of compensation, they would
have every incentive to look elsewhere for a remedy. Over 500 investors
have in fact done so, by bringing claims against Cheltenham and
Gloucester, W.B.B.S. and other building societies. So it does not look as if
the investors have been shy or backward in pursuing their rights.

As to the first objection, the structure and language of the claim form,
and the express provisions of section 54(2)(e) of the Act, do not suggest

D    that claims against participant firms were expected to be valueless. (It is
common ground that "person" in section 54(2)(e) means, and means only,
the participant firm.) It is true that Fisher Prew-Smith are in liquidation.
But other participant firms are not. Moreover the building societies are
not the only third parties likely to be worth suing. It must not be forgotten
that I.C.S. has brought proceedings against 197 firms of solvent solicitors.

E    In any event it is not for the court to speculate on what the parties would
have wanted. I accept, of course, as Mr. Vos observed, that I.C.S. is not a
charity. But it is far from being an ordinary commercial organisation. Its
raison d'être is the compensation of investors.

Even so, if I.C.S. had undertaken to compensate the investors in full
then one might perhaps have expected I.C.S. to insist on a transfer of all
third party rights. But that is not what has happened. It is common

F    ground that investors have retained rights of some kind against W.B.B.S.
That being so it would seem to me as likely as not, commercially, that the
agreement would provide for the investors to retain the whole of their
rights against W.B.B.S., including the right to claim damages in reduction
of their loans. Such a consequence cannot be regarded as "ridiculous" or
"extraordinary" or "very unreasonable."

G    Various other so-called anomalies are mentioned in Mr. Vos's written
submissions by way of reply. For example, a conscientious investor who
had used his compensation to pay off his mortgage would lose his rights
against W.B.B.S., since there would then be no sum to be abated, whereas
a less conscientious investor who had spent his compensation on a holiday
would retain his rights in full. I agree with Mr. Vos that there are
theoretical anomalies on the investors' construction, though how likely

H    they would be to arise in practice is another question. Where I disagree
with him is in his evaluation of these anomalies. In my judgment they fall
far short of the sort of absurdity which would justify the rejection of what
I have called the plain meaning of section 3(b). They do not prompt the
comment "whatever else the parties may have had in mind, they cannot
have meant *that*."

As for the legal consequences, the difficulties are all on the other side.
Both Evans-Lombe J. and the Court of Appeal were of the view that the

906

Lord Lloyd of Berwick   I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          [1998]

A

splitting of mutually inconsistent remedies in respect of a single cause of action against W.B.B.S. meant that the purported assignment was void for uncertainty, as well as being contrary to public policy. My noble and learned friend, Lord Hoffmann has found a way round that difficulty. But the difficulty does not arise at all on the investors' construction. If the whole of the investors' rights against W.B.B.S. are retained, the question of splitting remedies, and "dividing the indivisible" simply does not arise.

B

For the above reasons I would hold that on the true construction of the claim form the investors' claims against W.B.B.S. have been retained by the investors, and have not been assigned to I.C.S. It follows that the question whether if there had been an assignment, it would have been valid or invalid does not call for an answer. In the result, therefore, I would uphold the reasoning of the Court of Appeal and dismiss the main appeal.

C

*The claim against the solicitors*

I can deal with the remaining point quite briefly, since I agree with your Lordships that the investors' claims against their solicitors have been validly assigned to I.C.S., and that this part of the appeal should therefore be allowed. There can be no doubt that paragraph 6 of section 4 purports to transfer to I.C.S. the investors' rights against the solicitors. There is no issue as to the meaning of paragraph 6 in that connection. The only question is whether the assignment is effective in law. Evans-Lombe J. dealt with the point briefly at the end of his judgment. Having held that it was not possible in law to assign some but not all remedies in respect of a single cause of action, he went on to conclude that the same reasoning must also apply, logically, to the claim against the solicitors, since the solicitors might wish to bring in W.B.B.S. as third parties.

D

E

Mr. Sumption supports the judge's conclusion. He submitted that the purported assignment is void, because it is legally impossible for the investors to assign their right to claim against the solicitors while retaining the right to claim against W.B.B.S. in respect of the same loss. Mr. Sumption was not able to point to any authority in support of this submission. He relies instead on the traditional antipathy of the courts to the assignment of bare rights to litigate. Alternatively he submits that if there can be an assignment at all in such circumstances, it will only be effective in law if the parties have agreed as to their respective priority. In the absence of agreement, the court has no means for deciding between competing claimants in regard to the same loss.

F

Since the claims against W.B.B.S. and the solicitors give rise to separate causes of action, the problem of splitting remedies in respect of the *same* cause of action, which Evans-Lombe J. and the Court of Appeal regarded as insoluble, does not arise in so acute a form. I believe it could be solved satisfactorily by sensible case management. But I need not develop the matter further. For Mr. Sumption concedes that if the main appeal is allowed, as your Lordships propose, then the appeal in the solicitor's action must also be allowed.

G

H

LORD HOFFMANN. My Lords, The Investors Compensation Scheme was set up pursuant to section 54 of the Financial Services Act 1986 to provide a compensation fund for people who have unsatisfied claims against persons authorised under the Act to carry on investment business. The rules under which the scheme is administered provide that, on paying compensation, the company managing the scheme is to take over the

A    applicant's rights against the authorised person and also, if the management
company so determines, any rights he may have against other persons
relating to the subject matter of his claim.
    In 1992 the management company, called Investors Compensation
Scheme Ltd. ("I.C.S."), began to receive a large number of claims from
home owners, mainly elderly retired people, who had been advised by
authorised persons, independent financial advisers belonging to the
B    Financial Intermediaries, Managers and Brokers Regulatory Association,
to enter into schemes called "home income plans." These schemes had
been marketed by the financial advisers in conjunction with certain
building societies during the late 1980s and involved the owners mortgaging
their homes to secure advances at enhanced rates of interest which they
mainly invested in equity-linked bonds. The subsequent fall in equities and
C    house prices and the rise in interest rates had caused the owners severe
losses. They had claims against the financial advisers for negligence and
breach of their statutory duties under the Act of 1986 as well as possible
claims against the building societies and the solicitors who had acted in
connection with the mortgages.
    I.C.S. drafted a claim form for the home owner claimants (whom
I shall call "the investors") to sign. We shall have to examine it later in
D    some detail. For the moment it is enough to say that it contained an
assignment to I.C.S. of all the investor's rights arising out of the transaction
against the financial advisers and anyone else, subject to a reservation of
certain rights against the building society. This reservation, in section 3(b)
of the form, has given rise to this litigation. Evans-Lombe J., who had to
determine its meaning as a preliminary issue, thought that it was trying to
E    reserve to the investor a part of his rights against the building society but
that an assignment to I.C.S. of his remaining rights was legally impossible
and invalid. An assignment of the investor's rights in respect of the same
losses against the solicitors was also legally impossible and the whole
assignment was therefore a failure. The Court of Appeal disagreed with
the judge about the meaning of section 3(b). They thought it was intended
to reserve to the investor the whole of his rights against the building
F    society. But they agreed that if it had been intended to assign part, it
would have been ineffective. They also agreed that the assignment of rights
against the solicitors was invalid. The unanimous view of the judge and
the Court of Appeal was therefore that I.C.S. had no title to claim against
either the building societies or the solicitors. Against this decision I.C.S.
appeals to your Lordships' House.
G    My Lords, I must start by setting out the material provisions of
section 54 of the Act of 1986, the Rules under which the Scheme is
operated and the claim form which the investors signed. First, the Act:

    "54(1) The Secretary of State may by rules establish a scheme for
    compensating investors in cases where persons who are or have been
    authorised persons are unable, or likely to be unable, to satisfy claims
H    in respect of any description of civil liability incurred by them in
    connection with their investment business. (2) Without prejudice to
    the generality of subsection · (1) above, rules under this section
    may—(a) provide for the administration of the scheme and, subject to
    the Rules, the determination and regulation of any matter relating to
    its operation by a body appearing to the Secretary of State to be
    representative of, or of any class of, authorised persons; (b) establish
    a fund out of which compensation is to be paid; (c) provide for the

908

Lord Hoffmann        I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))        [1998]

A

levying of contributions from, or from any class of, authorised persons
and otherwise for financing the scheme and for the payment of
contributions and other money into the fund; (*d*) specify the terms
and conditions on which, and to the extent to which, compensation is
to be payable and in any circumstances in which the right to
compensation is to be excluded or modified; (*e*) provide for treating
compensation payable under the scheme in respect of a claim against
any person as extinguishing or reducing the liability of that person in
respect of the claim and for conferring on the body administering the
scheme a right of recovery against that person, being, in the event of
his insolvency, a right not exceeding such right, if any, as the claimant
would have had in that event; and (*f*) contain incidental and
supplementary provisions."

B

Next, the rules. They are called the Financial Services (Compensation
of Investors) Rules 1990 and were made by the Securities and Investment
Board, exercising the powers under section 54 delegated by the Secretary
of State. In these Rules, I.C.S. is called "the management company" and
the financial advisers and other authorised persons are called "the
participant firms." For present purposes it is necessary to refer only to the
following rules:

C

"2.02 Payment of compensation

"1. The management company is responsible for paying compensa-
tion to investors in accordance with these rules.

"2. The management company may pay compensation where it is
satisfied, on the basis of evidence provided by an investor or which is
available to it from other sources, that: (a) an eligible investor has
duly applied for compensation; (b) the investor has a claim against a
participant firm in default ... (c) the participant firm is unable or
unlikely to be able to meet the claim within a reasonable period; and
(d) the investor has agreed, to the satisfaction of the management
company, that the whole or any part of his rights in the claim and, if
the management company so determines, any rights of his in a claim
against any other person which relate to the subject matter of the
claim, should pass to it."

D

E

F

"2.10 Recoveries

"1. Where, in connection with the payment of compensation, an
investor agrees that the whole or any part of his rights in a claim
against any person are to pass to the management company, the
payment of compensation extinguishes the liability of that person to
the investor in respect of that claim or part and confers on the
management company a right of recovery against that person which
is otherwise identical to the investor's former rights in the claim or
part thereof."

G

Finally we must look at the claim form. Various editions were produced
in 1992 but for present purposes nothing turns on the differences. This
case concerns a form used for claims in respect of a financial adviser called
Fisher Prew-Smith Financial Services Ltd. ("F.P.S.") which had marketed
its home income plan in conjunction with the West Bromwich Building
Society ("W.B.B.S."). I shall refer to the one which was in use in July 1993.

H

Sections 1 and 2 dealt with the personal details of the claimants and
the amount of compensation payable. Section 3(a) was called "claimant's
declaration" and contained the following statements:

"I/we confirm that we have received no compensation of any kind in
respect of the amounts owed to us at the date of default by [F.P.S.] or

A    any other person. I/we also confirm that I/we do not expect to receive
any such compensation in the future. Any such compensation received
by me/us, I/we will pay to [I.C.S.] in accordance with section 4
attached hereto. I/we understand that, subject to section 3(b) below
... 2. [I.C.S.] in its capacity as administrator of the scheme will take
over my rights and claims against [F.P.S.] and other third parties on
the payment of any compensation as described in the transfer of
B    rights at section 4 of this form. Any amount received will be paid
direct to [I.C.S.] and any amounts (less costs and interest) which
exceed the compensation payment will be paid to me/us."

Section 3(b), which has given rise to all the difficulty, read, as follows:

"I.C.S. agrees that the following claims shall not be treated as a 'third
party claim' (as defined in section 4 of this form) for the purposes of
C    this agreement and that the benefits of such claim shall enure to you
absolutely: Any claim (whether sounding in rescission for undue
influence or otherwise) that you have or may have against the
[W.B.B.S.] in which you claim an abatement of sums which you would
otherwise have to pay to that society in respect of sums borrowed by
you from that society in connection with the transaction and dealings
D    giving rise to the claim (including interest on any such sums)."

Finally, section 4 contained a statement that:

"I/we, the claimant, agree and acknowledge as follows: 1. I/we agree
that my/our rights against [F.P.S.] in respect of the claim shall pass to
[I.C.S.] on payment of compensation ... 2. I/we agree that we will
accept the sum of ... from I.C.S. in satisfaction of my/our entitlement
E    to compensation under the rules in respect of the claim. 3. I/we
acknowledge that under the rules on payment of the amount of ...
I/we will no longer have the right to make a claim against [F.P.S.] in
respect of the claim and that any such right will be vested in I.C.S.
pursuant to the rules, and I/we further acknowledge that any sums
which would otherwise be payable to me/us in respect of the claim by
F    [F.P.S.] ... shall be paid instead to I.C.S. 4. So far as any rights in
respect of the claim would otherwise remain vested in me/us, I/we
agree that I/we assign those rights to I.C.S. to the extent of the
amount of the said compensation and scheme interest paid. 5. I/we
agree that in the event of my/our receiving any moneys or assets in
respect of the claim from [F.P.S.] ... I/we will forthwith pay or transfer
them to I.C.S. 6. I/we hereby assign absolutely to I.C.S. each and
G    every third party claim and the benefit thereof. 7. I.C.S. agrees and
acknowledges that in the event that it recovers any moneys in respect
of a third party claim, it will pay to you a sum equivalent to the
aggregate of:—(a) the moneys which I.C.S. has recovered in respect of
the third party claim; and (b) any moneys which I.C.S. has recovered
in respect of the claim; and (c) any moneys which I.C.S. has recovered
pursuant to clause 5 or 6 above; *less* (i) the amount of compensation
H    which I.C.S. had paid to you; (ii) such amount in respect of interest
as I.C.S. considers just; and (iii) the costs which I.C.S. has
incurred in effecting, or in attempting to effect, any such recovery.
8. I/we agree that I/we will provide all reasonable co-operation and
assistance that I.C.S. asks me/us to give in connection with any
pursuit by I.C.S. of claims corresponding to the claim and of any
third party claim, including the provision of documents, the provision

910

Lord Hoffmann          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          [1998]

A

of statements, the swearing of affidavits and the attendance at court to give oral evidence. 9. I.C.S. may give a good receipt to any person in respect of any third party claim the benefit of which is assigned by this document. 10. I.C.S. will conduct all proceedings and settlement negotiations regarding claims assigned by you reasonably and with due regard to your interests as well as its own. 11. I.C.S. will reassign to you at your request any claim which it and, if relevant its insurers decide at any time not to pursue or to pursue further. 12. In this document, 'third party claim' means any right, claim or cause of action which the claimant has or may have against any person other than [F.P.S.] or against any fund or property in the hands of any person other than [F.P.S.] and arising out of the circumstances giving rise to the claim or otherwise relating to the claim, whether such claims shall arise in debt, breach of contract, tort, breach of trust or in any other manner whatsoever ..."

B

C

Although the form was obviously trying not to use too much legalese, it could not have been easy for the ordinary retired home owner to understand. It referred to technical concepts like "sounding in rescission" and "in debt, breach of contract, tort, breach of trust or in any other manner whatsoever." I.C.S. therefore also provided an explanatory note which was a model of clarity:

D

"1. Under this document, once you have received your compensation from I.C.S., you will not be able to sue the 'participant firm' mentioned above in relation to the claim which led to that compensation. This is because your claim is being met by I.C.S. instead (paragraphs 2 and 3). 2. But I.C.S. in turn may wish to recover some or all of its outlay to you by suing the firm, and you promise to help I.C.S. if I.C.S. decides to do so (paragraph 8). 3. Further, since you are being compensated in relation to this claim, you should not expect any more money for it from the firm (or liquidator) (second half of paragraph 3); and any money sent to you because of it (e.g. by the liquidator) is really due to I.C.S. instead of to you, so you must pay the money to I.C.S. (paragraph 5). 4. You also agree that I.C.S. should be able to use any rights which you now have against anyone else in relation to the claim. Examples might be directors of the firm or other persons also responsible for causing the loss for which you are being compensated. You give up all those rights and transfer them to I.C.S. (paragraph 6)."

E

F

Before I turn to the question of construction, I must provide some of the background to how this litigation has come about. A number of the home owners instructed a firm of solicitors called Barnett Sampson to negotiate their claims. The rules provided that claims were to be met "only where the management company considers that it is essential in order to provide fair compensation to the investor." I.C.S. decided that it would not pay compensation in respect of various heads of claim: in particular, that it would not reimburse money which the homeowners had given away or spent on themselves, or fees paid to lawyers and other professionals, or damages for illness, anxiety and stress. Barnett Sampson's clients challenged this decision in proceedings for judicial review but this House decided in *Reg. v. Investors Compensation Scheme Ltd., Ex parte Bowden* [1996] A.C. 261 that I.C.S. had acted within its powers.

G

H

I.C.S. then commenced proceedings against various building societies for compensation for breach of statutory duty under the Act of 1986 and

A    damages for breach of duty at common law, claiming to sue as assignee of
the investors. In proceedings against Cheltenham and Gloucester Plc.
(previously the Cheltenham & Gloucester Building Society) the society
took the point that section 3(b) of the claim form reserved to the investor
all claims against the society and that I.C.S. therefore had no title to sue.
Evans-Lombe J. ordered this question to be tried as a preliminary issue
and on 1 November 1995 gave a judgment in which he held that the only
B    right reserved by section 3(b) was the right of the mortgagor, on rescission
of the mortgage, to an adjustment of the mortgage debt as part of the
mutual restoration of benefits consequent upon rescission. The assignment
of the investor's right to damages for misrepresentation or breach of duty
was unaffected. A year later the same point came before Evans-Lombe J.
in proceedings by I.C.S. against W.B.B.S. By this time, I.C.S. had also
commenced proceedings against a large number of firms of solicitors who
C    had acted for investors in connection with the home income plans.
A number of investors represented by Barnett Sampson ("the Alford
plaintiffs") and another firm of solicitors ("the Armitage plaintiffs") had
also commenced separate proceedings against W.B.B.S. for rescission of
their mortgages and damages. Evans-Lombe J. therefore directed
preliminary issues on the question of who, as between I.C.S. and the
D    investors, had the title to sue W.B.B.S. for damages. These are the
proceedings which are the subject of this appeal to your Lordships' House.

My Lords, I start with the construction of section 3(b). Evans-
Lombe J. followed his own decision in the earlier *Cheltenham and
Gloucester* case and I shall first summarise his reasoning and then that of
Leggatt L.J. in the Court of Appeal. Evans-Lombe J. focused on the words
"any claim (whether sounding in rescission for undue influence or
E    otherwise) that you have ... against the ... society in which you claim an
abatement of sums which you would otherwise have to repay to that
society ..." According to ordinary rules of syntax, "any claim" is the
antecedent of "that you have" and the words "or otherwise" in the
adjectival parenthesis mean that it does not limit the breadth of "any
claim." It follows that claims of any description are reserved as long as
F    they amount to claims for an "abatement" of what is owing to the Society.
There are various ways in which the amount owing might be abated but
one would be on account of a set-off against the society's liability for
damages. Thus the syntax of the words following "any claim" points to a
wide meaning of "abatement" which includes the effect of cross-claims.

Evans-Lombe J. then turned to the background against which the
language in the claim form had been used. Two features seemed to him·
G    odd. First, the building society and the solicitors were the only solvent
parties against which the investors were likely to have any claim. As
between the building society and the solicitors, the former would certainly
be the prime target. It had profited from the home income plans by
lending money at enhanced rates of interest on safe security (maximum of
50 per cent. of value) at a time when lenders were falling over themselves
H    to lend as much money as possible. One might expect that I.C.S., having
paid compensation to the investor, would take over his claim against the
building society. If not, the investor might well be overcompensated. Other
provisions of the form, like clause 7, seemed to assume that I.C.S. would
do the suing and account to the investor for the net recovery in excess of
the compensation paid. But there was no provision for the investor having
to pay anything back to I.C.S. This pointed to I.C.S. being entitled to any
recoverable damages.

912

Lord Hoffmann          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          [1998]

Secondly, the parenthesis seemed very strange against the background    A
of the law. If it was exhaustive, why was "sounding in rescission for undue
influence" singled out? What about rescission on other grounds, or claims
for breach of statutory or common law duty? It was rather like providing
in a lease of a flat that the tenant should not keep "any pets (whether
neutered Persian cats or otherwise)." Something seemed to have gone
wrong.

Considerations of this kind led the judge to conclude in the *Cheltenham*    B
*and Gloucester* case that the wider construction of "any claim" and
"abatement" led to a "ridiculous commercial result which the parties to
the claim forms were quite unlikely to have intended" and that it was clear
that "the drafting of the second paragraph of section 3(b) was mistaken."
He therefore concluded that the meaning intended by the parties was that
the investor should retain any claim for an abatement of his debt which    C
arose out of a claim for rescission, whether for undue influence or
otherwise. This could be fitted easily into the scheme of the law because
the old equitable remedy of rescission included, as part of the restitutio in
integrum, an accounting for benefits and indemnity against liabilities which
could result in an abatement of the mortgage debt. Such a remedy was
quite separate from a common law action for misrepresentation or breach
of statutory duty. But the judge seems to have had some misgivings about    D
his interpretation: he said that was doing violence to the natural meaning
of the words and altering the drafting of the paragraph in a way "more
appropriate to rectification than the process of construction." In the
present case, however, the judge adhered to his construction and gave some
additional reasons.

In the Court of Appeal, Leggatt L.J. said, on the authority of *Through*    E
*the Looking-Glass*, that the judge's interpretation was "not an
available meaning of the words." "Any claim (whether sounding in
rescission for undue influence or otherwise)" could not mean "Any claim
sounding in rescission (whether for undue influence or otherwise)" and
that was that. He was unimpressed by the alleged commercial nonsense of
the alternative construction.

My Lords, I will say at once that I prefer the approach of the judge.    F
But I think I should preface my explanation of my reasons with some
general remarks about the principles by which contractual documents are
nowadays construed. I do not think that the fundamental change which
has overtaken this branch of the law, particularly as a result of the
speeches of Lord Wilberforce in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381,
1384–1386 and *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976]    G
1 W.L.R. 989, is always sufficiently appreciated. The result has been,
subject to one important exception, to assimilate the way in which such
documents are interpreted by judges to the common sense principles by
which any serious utterance would be interpreted in ordinary life. Almost
all the old intellectual baggage of "legal" interpretation has been discarded.
The principles may be summarised as follows.

(1) Interpretation is the ascertainment of the meaning which the    H
document would convey to a reasonable person having all the background
knowledge which would reasonably have been available to the parties in
the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as
the "matrix of fact," but this phrase is, if anything, an understated
description of what the background may include. Subject to the requirement
that it should have been reasonably available to the parties and to the